WARRICHAIET, Administrator, Plaintiff, vs. STANDARD OIL
COMPANY, and others, Defendants.   [Two cases.]

*December 6, 1933—January 9, 1934.*

For the plaintiff Warrichaiet, administrator, there was a brief by *Allan V. Classon,* attorney, and *Thomas V. Dono-*

*ghue* of counsel, both of Oconto, and oral argument by *Mr. Classon.*

For the defendants Standard Oil Company and William Telford there were briefs by *North, Bie, Duquaine, Welsh & Trowbridge* of Green Bay, and oral argument by *Walter T. Bie.*

*John B. Chase* of Oconto, for the defendant O. P. Safford.

FRITZ, J.  Plaintiff, as administrator of the estates of Elvira and Arvilla Warrichaiet, deceased, who were respectively his wife and his daughter, and who sustained injuries on September 10, 1932, upon an explosion of a mixture of kerosene and gasoline oils, which resulted in their deaths, sued the defendants to recover the damages sustained by reason of those injuries and deaths.  The oil which exploded was part of one gallon which was purchased on September 6, 1932, for plaintiff by his daughter at the retail store of the defendant Safford.  The latter claimed that that gallon was part of a fifty-gallon delivery which was put into his kerosene storage tank at his store on August 22, 1932, during his absence, by the defendant Telford, an employee of the defendant Standard Oil Company, in charge of its bulk storage station at Oconto.  Undisputed evidence established that from that station the Standard Oil Company delivered gasoline, kerosene, and similar products to customers in the surrounding territory by means of two tank trucks, one of which was usually driven by Telford, and the other by Fred Koeppen; that on August 22, 1932, Telford received by telephone an order from Safford's store for kerosene; that no amount was specified; but Telford knew the capacity of Safford's kerosene tank and that he would want either fifty or fifty-five gallons.

Telford and Koeppen testified that when that order was received, Telford's truck was loaded to full capacity with

gasoline, ready to leave on a trip to fill orders in the direction of Safford's store; that at about the same time Koeppen drove into the station with the other truck; that Telford told Koeppen to get a barrel, in which to take the kerosene to Safford's store, rather than make a special trip with the other truck for only fifty gallons; that Telford's truck had a rack on its side for the purpose of carrying a barrel; that Koeppen took an empty oil barrel off the stock pile and was given about a gallon and a half of kerosene by Telford, and with that Koeppen rinsed out the barrel; and when it was cleaned, he poured that kerosene into an oil pail in which paint brushes were kept; that Koeppen then put the barrel on the rack on the truck and Telford filled it with fifty-five gallons of kerosene, which he drew directly from his employer's kerosene storage tank; that Telford and Koeppen then went with the truck to Safford's store, and stopped *en route* to deliver gasoline to one customer; and that at Safford's store they unloaded the barrel onto a concrete platform in front of the store, and put in a faucet to drain the kerosene.

It was established by undisputed evidence that Safford's kerosene storage tank was in the basement of his store. That basement was approximately six and one-half feet deep and had concrete and stone walls two feet thick and a concrete floor. The kerosene tank was in the southwest corner and from it to a pump on the first floor there was a pipe, which was used to pump up kerosene directly into the customers' containers. That tank held from fifty-eight to sixty gallons and was filled by carrying the kerosene in five-gallon buckets into the cellar through an outdoor cellar entrance, which was located thirty-five feet from the tank, at the middle of the east side of the store. A concrete platform, about three feet high, extended along the front of the store, which faced south. It was thirty feet from the east end of that platform to the cellar entrance. On that platform on the

outside of the store there was another pump connected by a pipe to a gasoline tank which was in the ground outside of the store and basement, at the southwest corner thereof. Telford and Koeppen further testified that after placing that barrel on the concrete platform, Telford drove the truck out of the way to a near-by vacant space and Koeppen then drew the oil from the barrel into five-gallon buckets, which he carried to the basement entrance and there gave to Telford, who took them into the basement and emptied their contents into the storage tank; that the buckets which they used were carried on the truck for that purpose and that they were unpainted to distinguish them from the red buckets used to carry gasoline; that there were three or four gallons in the bottom of Safford's tank when Telford began to fill it; that when he had put in fifty gallons, the tank was so full that it would not hold another bucketful, and that he told Koeppen not to draw the last five gallons from the barrel; that they remained in the barrel and were taken back in it to Oconto and subsequently sold to one Rasmussen; and that on that day nothing was drawn from the tank of the truck at Safford's store.

Telford testified that during the preceding twelve years he had, on but one other occasion, delivered kerosene to Safford's store in a barrel and that at all other times he had hauled it in the tank of the truck. It appears that after filling the tank, Telford gave to Safford's wife a delivery slip for fifty gallons of kerosene, and then drove away. Mrs. Safford had been in the rear of the store while the oil was being delivered, and no one else than Telford and Koeppen testified as to how the delivery was made. Safford and his wife, and two other persons who occasionally assisted in and about the store during 1932, and were the only persons so employed, all testified that they had never put any gasoline or similar liquid into Safford's kerosene storage tank. Safford returned to the store late that afternoon, and at about

six o'clock p. m. he made the first sale from that tank to Arnold Plumb. From that time and up to September 11th he sold from that tank to sixteen customers about fifty-three gallons in one to five-gallon lots, and there may have been one or two cash sales of which he had kept no record. There is no evidence that during that period Safford had put any liquid into that tank, excepting one gallon which he had pumped out of it on September 4, 1932, into an empty kerosene can, belonging to the plaintiff, which a milk hauler had brought to Safford's store to get kerosene for plaintiff. After pumping that gallon, Safford had discovered that it was intended for plaintiff and that he had no credit. Thereupon he poured that gallon into a pan at the pump, from which it drained through the pipe directly back to the tank. That can had been used by plaintiff only for kerosene and no gasoline had been used or kept on his farm for a considerable period, excepting possibly some that may have remained in a discarded automobile. After Safford had emptied that can on September 4, 1932, the milk hauler had returned it to plaintiff and nothing was put into it until on September 6, 1932, when plaintiff's children brought the can to Safford's store to purchase one gallon of kerosene and Safford pumped one gallon into it from his kerosene storage tank. The children took that can home and it was placed in a pantry after filling some lamps.

On the evening of September 10th, plaintiff's wife, Elvira Warrichaiet; put some dry wood in the kitchen, stove, in which there was no fire. Then she poured a very small amount of the oil from the can onto the wood. She either set the can down on the floor or held it in her hands. Then she took a match and set fire to the wood and placed some pans on the stove over an opening. Next she picked up the can and started to return it to the pantry, when a loud explosion took place inside of the can and blew out the bottom thereof and scattered the oil therein onto Arvilla, a thirteen-

year-old child, who was sitting on the floor, and onto Mrs. Warrichaiet. Both were immediately enveloped in flames. Arvilla ran out into the yard. Mrs. Warrichaiet ran to the front of the house. There the plaintiff picked up a rug and, guarding his face from the flames, threw the rug about his wife and extinguished the fire. However, practically all of her clothing with the exception of a corset had been burned off of her. Next plaintiff ran out to Arvilla, but before he could aid her, the overalls which she wore were practically burned off of her.

There had been no explosion whatsoever in the stove and the fire continued burning therein. None of its doors were broken open although it was very old and dilapidated, with burned-out grates, and the pans on the stove at the time of the explosion of the can were not disturbed. The explosion had occurred entirely within the oil container.

On learning of the explosion the next morning Mrs. Safford telephoned to Telford and he had Clifford Swanson, a safety supervisor employed by the Standard Oil Company, accompany him to Safford's store to investigate the accident and whether his employer was involved. Swanson took all of the kerosene, approximately four gallons, which was left in Safford's storage tank and put it in a can, which he labeled. He made a flash test thereof and found that it flashed at 95° Fahrenheit, which showed it to be an illegal mixture. The next day he again went with Telford to Safford's store to locate and pick up all kerosene which had been sold from Safford's storage tank after August 22d. Safford gave Swanson a list of all customers to whom it was sold, and Swanson called on them and obtained all the kerosene that they still had on hand, including part of the two gallons sold by Safford to Arnold Plum shortly after Telford filled the tank. Swanson also took about three gallons which he found in a five-gallon can standing alongside of Safford's storage tank. Telford testified that one Gaunthier, a driver

working under Telford, had put kerosene in that can in February or March of 1932. It is undisputed that the samples of all of the oil thus gathered up by Swanson were tested by the Standard Oil Company and found by it to be a highly explosive and dangerous mixture of kerosene with from five to ten per cent. of gasoline.

Under sec. 168.06, Stats., the sale or use of kerosene oil for illuminating or heating purposes which has a flash point of less than 105° Fahrenheit, open test, is prohibited and illegal. The sample taken from the five-gallon can which was next to the storage tank and tested, flashed at 70° Fahrenheit. The samples obtained from ten of those eleven customers flashed respectively as follows: at 60°, 72°, 73°, 76°, 78°, 80°, 80°, 82°, 83° and 88°; and that obtained from Arnold Plumb, who was the first purchaser, flashed at 66°. A sample of the oil which was left in one of plaintiff's lamps after the explosion, and which was delivered to plaintiff's attorney the morning after the accident, flashed at 78° Fahrenheit. On the other hand, a sample taken from the Standard Oil Company's kerosene storage tank at Oconto flashed at 156° Fahrenheit, which indicated pure kerosene, and there was testimony that the oil in that tank, when it was officially tested by the state inspector upon its arrival on May 19, 1932, flashed at 154°.

On the trial, as well as on this appeal, Telford and the Standard Oil Company contended that they were entitled to a directed verdict and for judgment because there was insufficient evidence as to who made the mixture to take the case out of the realm of conjecture. However, the court submitted to the jury questions for a special verdict, pursuant to which the jury found, in addition to assessing damages, that Telford, and the Standard Oil Company by and through its employees, did cause the liquid, which was in Safford's kerosene tank and one gallon of which was sold to the plaintiff on September 6, 1932, to be mixed with gasoline; that the character of that mixture was a cause of the

explosion in plaintiff's home; that neither Safford nor his agents or employees caused that liquid to be mixed with gasoline; that Elvira Warrichaiet was not negligent in the manner in which she lighted the fire with the use of the oil in question.

At the outset it must be noted that, if the oil which was delivered to plaintiff by Safford was kerosene mixed with gasoline in such proportion as to be highly explosive and dangerous, then it is obvious that some person or persons were negligent in respect thereto. *Ellis v. Republic Oil Co.* 133 Iowa, 11, 110 N. W. 20. A review of the record discloses ample credible evidence which convincingly establishes that the oil sold from Safford's kerosene storage tank, commencing within three hours after Telford's delivery and including the last sale made therefrom on September 7th, was highly explosive and dangerous because it contained from five to ten per cent. of gasoline. Gasoline in that highly dangerous proportion was undoubtedly in all of the fifty-five to sixty gallons which were in that tank when Safford first pumped therefrom the two gallons which he sold to Plumb on August 22, 1932, as well as during the entire period thereafter, in which at least fifty-one gallons thereof were pumped from that tank and sold to ten other purchasers. As all of those sales with the exception of three gallons were made before Safford, on September 4th, poured back into the tank the one gallon which he had just pumped therefrom, the jury could well consider it improbable that the dangerous mixture occurred by reason of Safford's pouring that gallon back into the tank. Likewise it was within the jury's province under the evidence to believe that no gasoline was ever poured into that tank by Safford, his wife, the two persons whom he had occasionally employed, or any unknown person.

On the other hand, if the jury believed the testimony of Telford and Koeppen that the only oil which they put in Safford's kerosene tank on August 22, 1932, was kerosene

which they put directly from the Standard Oil Company's kerosene storage tank at Oconto into an empty barrel, after first cleaning that barrel with kerosene only and then completely draining out that kerosene, then it would necessarily follow that they did not cause the oil in Safford's tank on that day to become a dangerous mixture because of the addition of gasoline. Obviously, there is an irreconcilable conflict in the evidence in support of the version contended for on behalf of Safford, and the version relied on by the Standard Oil Company and Telford. With a dangerous proportion of gasoline unquestionably in the liquid in Safford's tank the very first time oil was sold therefrom after Telford's delivery, it was either true that the gasoline alone or as part of a mixture had probably entered that tank before or within two hours after that delivery, or it was true that it had probably entered as part of the fifty gallons which were put into it by Telford. With that conflict in the evidence it was for the jury to determine whose version was true, and to reject as unbelievable the evidence relied upon as the basis for the conflicting version. So, if the jury did not believe—as appears from the verdict to have been the situation—the testimony of Telford and Koeppen, it could reject entirely the version relied upon by the Standard Oil Company and Telford that they delivered the oil for Safford in a barrel instead of in the tank of the truck, or the version that Koeppen had properly cleaned the barrel with kerosene and not with a gasoline in such quantity as to constitute a dangerous mixture when not properly drained from the barrel. On the other hand, as there was gasoline in close proximity to the kerosene storage tank at the Standard Oil Company's plant at Oconto, as well as in the tank of the truck which Telford was using, the addition of five or ten gallons of gasoline in the mixture put in Safford's tank may have been believed by the jury to have been made by Telford and Koeppen, either as part of the fifty-five gallons of oil

which they had put into a barrel at Oconto, or from the gasoline which they had in the tank of the truck while making the delivery to Safford. If the jury did not believe that a barrel was used, but that kerosene was transported in the tank of the truck, then, as the presence of gasoline in Safford's tank immediately after Telford's delivery is well established, the jury could consider it probable that some gasoline may have been in that tank when the kerosene intended for Safford was put into it at Oconto, or that Koeppen, in drawing the kerosene from one compartment of that tank, while filling the five-gallon buckets at Safford's store, had by mistake drawn some gasoline from the faucet of another compartment of the tank, in which it was being transported for delivery to other customers. In either event, with the probability that gasoline entered Safford's tank either before or subsequent to Telford's delivery excluded by the jury's acceptance of Safford's version, it devolved upon Telford and his employer to establish by proof believed by the jury the existence of facts and circumstances which absolved them from liability.

Under the evidence in this case, as under the evidence in *Ellis v. Republic Oil Co., supra,* it was within the province of the jury to find that the balance of probabilities under the evidence indicated that as between Telford and his employer, on the one hand, and Safford, on the other hand, the probabilities were greater that the former were at fault because of a mistake in either leaving gasoline in the barrel or in the compartment of the truck before putting in the kerosene, or in opening the wrong faucet and drawing a bucket of gasoline from the tank of the truck instead of kerosene, when putting the liquid in Safford's tank at his store. In the case at bar, as in the case of *Hertzler v. Manshum,* 228 Mich. 416, 200 N. W. 155, in relation to an analogous state of affairs under the evidence in a case to recover for damages sustained because of poisoned flour sold by a retail dealer,

*prima facie* the mixture was dangerous because of some one's negligence; and upon proving that it was purchased from Safford, plaintiff made out a *prima facie* case against those who delivered that mixture for use as kerosene. If Safford satisfied the jury that the mixture was delivered by him, without knowledge of its dangerous· character, to plaintiff, in the same condition in which it was when put by Telford into Safford's tank, then the evidence admits the jury's finding that Telford and his employer caused liquid in Safford's tank to be mixed with gasoline, and that Safford did not cause the mixture with gasoline. There is no evidence which can be considered to account in some other manner for the presence of the gasoline in the mixture, or that it is probable that it became part thereof otherwise than by reason of the acts with which either Safford or Telford and his employer are chargeable. Consequently, the decisions in such cases as *Musbach v. Wisconsin Chair Co.* 108 Wis. 57, 84 N. W. 36, and *Quass v. Milwaukee Gas Light Co.* 168 Wis. 575, 170 N. W. 942, are not in point. On the other hand, to say that gasoline may have been introduced into the mixture by the negligence or the mischievous or malicious intervention of some stranger concerning whom there is no testimony, would be improperly entering the field of conjecture in search of a reason for disregarding legitimate and material evidence in the record, from which sufficient inferences can rightfully be drawn to sustain the findings of the jury. *Ellis v. Republic Oil Co., supra; Davis v. Van Camp Packing Co.* 189 Iowa, 775, 176 N. W. 382; *Anderson v. Standard Oil Co.* 180 Iowa, 1054, 164 N. W. 169; *Crigger v. Coca Cola Bottling Co.* 132 Tenn. 545, 179 S. W. 155, L. R. A. 1916 B, 877; *Waters-Pierce Oil Co. v. Deselms,* 212 U. S. 159, 29 Sup. Ct. 270, 53 Lawy. Ed. 453. It follows as a matter of law that the evidence fairly admits of the jury's findings, and the conclusions upon those findings, that Telford and his employer, and not Safford, are

legally responsible for the condition of the mixture at the time of its delivery to Safford, and the damages which resulted because of that condition.

The Standard Oil Company and Telford also contend the court erred in admitting testimony as to the result of tests of kerosene claimed to have been purchased from Safford's store about the time the plaintiff purchased the kerosene which exploded, without any evidence that such kerosene actually came from Safford's store, and without any evidence as to how the kerosene, if it was purchased at that store, was kept by the customers up to the time of the tests. It was established without objection that those tests were of samples which were gathered on the 12th and 13th of September, 1932, by the Standard Oil Company's representative Swanson, directly from the customers who had purchased their kerosene at Safford's store between August 22d and September 1st. Swanson gathered all of that oil that the customers had left. It was all kept and the samples thereof were all tested by the Standard Oil Company. After these actions were commenced, plaintiff demanded, under sec. 327.22, Stats., that the defendants Standard Oil Company and Telford admit or refuse to admit the existence of certain facts set forth in plaintiff's demand. Pursuant thereto those defendants admitted that the tests were made and the results thereof showed the flash points varying from 60° and 66° to 83° and 88°, which have heretofore been mentioned. Other proof, likewise received without objection, showed that the oil left in Warrichaiet's lamp, and which was part of that purchased by him on September 6, 1932, flashed at 78°. The evidence as to the circumstances and care under which the Standard Oil Company obtained and accepted that oil, after its investigations, as oil which had been procured from Safford between August 22d and September 10th by his customers, and the established similarity of the proportions of kerosene and gasoline in the mixture,

as indicated by the dangerously low flash points, shown by the tests of oil obtained from a number of customers, as well as that which was left in Safford's basement and in Warrichaiet's lamp, and as to which there was uncontradicted proof regarding the source and manner of keeping, admitted of the inferences that probably all of the oil had been obtained by the customers from the same source, and had been kept by each of them in about the same manner, which was probably the usual and customary manner under normal conditions.

Telford and his employer also assign as error the refusal of the court to grant a new trial because of excessive damages. That contention is made principally in relation to the amounts awarded as damages for pain and suffering. There was no dispute as to the expenses for hospital, doctor, and funeral bills. The court approved the jury's assessment for the pain and suffering of plaintiff's wife at $10,400, and for his damages for pecuniary loss at $6,350, and his loss of her society at $2,000. They had been married fourteen years. She had been in good health and was thirty-two years of age when she died. Plaintiff was thirty-five years of age. They had six children, of which five, ranging from two to eleven years, survived after the death of Arvilla. The wife was able and industrious. In addition to attending to the children and the housework she assisted plaintiff in all of the farm work, without any other help for either the house or the farm, excepting that of Arvilla, who was thirteen years of age when she died. As a result of the explosion and fire, both the wife and daughter were severely burned about the arms, abdomen, limbs, and feet. As to the wife, the attending physician testified:

"Then I proceeded to clean up the burns. I found that many areas were burned to a crisp. . . . There were areas when the serum had gotten under the skin and elevated it from the tissues underneath; it was cooked white. The

soles of her feet were detached so that they almost could be removed like a slipper.. I removed them. They were attached near the toes and came off very easily. The burns were first, second and third-degree burns. . . . She cried when the nurses appeared in the room, for whenever the dressings were to be done she started to cry and begged that it not be done. She continued for an hour after the dressing had been done. We gave her as little opiates as we could, because in a case like that if there is a chance of recovery we don't want to make them an addict. She had about twenty doses supplemented by other sedatives, allonal and luminal. That relieved the pain, but I think she still suffered pain."

During the seventy-three days that she lived after the accident her pains and suffering were so excruciating that the jury's assessment of $10,400 as her damages on that account is not excessive. That averages at about $142 per day, which is considerably less per day than this court has approved in other cases involving pain and suffering that was not as severe as in the cases at bar. Thus, this court approved as damages for pain and suffering, because of injuries that resulted in death: $500 for three hours, *Wasicek v. M. Carpenter Baking Co.* 179 Wis. 274, 191 N. W. 503; *Prange v. Rognstad,* 205 Wis. 62, 236 N. W. 650; $500 for three days, *Rogers v. Lurye Furniture Co.* 193 Wis. 496, 211 N. W. 782, 215 N. W. 457; and $750 for thirty hours, *Theby v. Wisconsin Power & Light Co.* 197 Wis. 601, 222 N. W. 826, 223 N. W. 791. Awards at that rate are not unreasonable in comparison with awards for pain and suffering which have been approved in other jurisdictions, as for instance, $5,000 for approximately one-half hour, *St. Louis, I. M. & S. R. Co. v. Craft,* 237 U. S. 648, 35 Sup. Ct. 704, 59 Lawy. Ed. 1160; $4,000 for four hours, *Stone v. Sinclair Refining Co.* 230 Mich. 472, 202 N. W. 1004; $6,750 for six days, *Bowling Green Gas Light Co. v. Dean's Ex'x,* 142 Ky. 678, 134 S. W. 1115; $5,000 for seventeen hours,

*Paine v. Shepler* (Tex. Civ. App.) 243 S. W. 538; $2,250 for twenty-five minutes, *Gerow v. Seaboard Air Line R. Co.* 189 N. C. 813, 128 S. E. 345; $2,500 for twenty-four hours, *St. Louis, I. M. & S. R. Co. v. Robbins,* 57 Ark. 377, 21 S. W. 886. The jury's assessment of $2,000 on account of the pain and suffering sustained by the daughter, Arvilla, was reduced by the court to $750. Her injuries were so severe and her pain and suffering so intense that she lived only twenty-four hours after the accident. Under the precedents in this court which have just been cited in relation to such damages, the allowance of $750 was certainly not excessive; and, on the other hand, was not so low in amount that the court's order can be held to constitute prejudicial error, as contended by plaintiff on his motion to review. The awards on account of pecuniary loss to plaintiff as the surviving husband and father of $6,350 and $1,567, respectively, and for loss of society of $2,000 and $1,000, respectively, are not excessive. The facts stated above in relation to the wife warrant those amounts as his loss by reason of her death. In addition to the matters stated as to the daughter, it should be noted that she was a healthy, normal child, who had required no medical attention for the last ten years, and that she had been doing farm work and milked one cow, in addition to helping with the care of the other children and housework.

*By the Court.*—Judgments affirmed.