NYGAARD, Special Administratrix, Respondent, vs.
WADHAMS OIL COMPANY, imp., Appellant.

*February 9—May 9, 1939.*

For the appellant there were briefs by *Fish, Marshutz & Hoffman,* attorneys, and *I. A. Fish, G. R. Hoffman,* and *F. C. John* of counsel, all of Milwaukee, and oral argument by *Mr. Fish* and *Mr. Hoffman.*

For the respondent there were briefs by *Allan V. Classon* of Green Bay, *Tom Donoghue* of Oconto, and *Karl Hagemeister* of Green Bay, and oral argument by *Mr. Classon* and *Mr. Hagemeister*.

The following opinion was filed March 7, 1939:

FOWLER, J. As appears from the foregoing statement, a retailer sold to a customer contaminated kerosene into which the jury found a wholesaler, the Wadham's Oil Company, hereinafter referred to as the "company," had mixed a quantity of gasoline sufficient to make it a highly dangerous explosive. Plaintiff's decedent used the kerosene to start a fire, and an explosion resulted which set fire to his clothing and caused burns from which he died. This contamination resulted from one of two causes: The mixing of gasoline with kerosene by some person, or from the negligent construction of the venting system of the retail plant which permitted escape of gasoline through the venting system into the kerosene tank in filling a gasoline tank adjacent to the kerosene tank. By the verdict of the jury the cause was found to be negligence of the wholesaler in delivering kerosene to the retailer. If that finding is supported by the evidence the wholesaler must respond in damages.

The appellant assigns as error, (1) that the finding that it put gasoline in with the kerosene in delivering it is not supported by the evidence; and (2) that the assessment of damages for pecuniary loss was excessive. The plaintiff by motion to review claims, (3) that the court erred in deducting $1,250 from the award of damages for pain and suffering.

(1) If the gasoline became mixed with the kerosene through the act of some person, it must have been by the act of the company's deliveryman, Hansen, the act of Behling's man in delivering it to the customer, or the act of an intermeddler. There is no evidence of the latter, and the latter is unlikely because it would be an intentional wrong, neces-

sarily criminal, which is not to be presumed, and because the opening of the fill pipe to the kerosene tank is below a plank that has to be removed to get to it and is covered by a screw cap removable only by a wrench. There is no evidence that it was done in delivery to the customer. The evidence of Behling's servant is that he pumped the kerosene from the tank into an empty dry gallon measure and poured it therefrom directly into the customer's empty container. As soon as might be after the explosion the kerosene in the tank was tested and found to be contaminated. If the contamination was by the act of Behling or his agent, it must have been an intentionally wrongful and criminal act. So the jury were justified in finding that the contamination resulted from the personal act of Hansen if it resulted from the personal act of anybody. As the contamination necessarily resulted either from the personal act of Hansen or a defective venting system, how it resulted depends on the preponderance of the probabilities. A jury's verdict may be so sustained. *Vilter Mfg. Co. v. Industrial Comm.* 192 Wis. 362, 365, 212 N. W. 641; *Pfister & Vogel L. Co. v. Industrial Comm.* 194 Wis. 131, 134, 215 N. W. 815; *Acme Body Works v. Industrial Comm.* 204 Wis. 493, 497, 234 N. W. 756, 236 N. W. 378. Thus, whether the jury was warranted in attributing the contamination to Hansen depends on whether the evidence warranted the jury in inferring that it was more probable that it so resulted than that it resulted from the venting system. To determine whether the finding of the former is sustained requires a somewhat detailed statement of the evidence.

The flash test of the kerosene taken from the kerosene tank after the explosion was 65° F., instead of the test of 105° required by statute, sec. 168.06, and the test of around 155° uniformly stood by the kerosene sold by the defendant company. There was evidence that pouring five gallons of gasoline into forty-five gallons of kerosene in filling an order for fifty gallons of kerosene would produce a mixture that would

flash at about 65°. Twenty-eight gallons of kerosene remained in the tank when it was emptied shortly after the explosion. Kerosene had been sold from the tank in the meantime but there was no means of determining the exact amount. It was the custom of Behling as a means of avoiding waste from overflow to measure the oil in a tank before refilling it and in ordering gasoline not to order more than to fill the tank to within twenty-five gallons of capacity. The faucets of the Mobile gasoline compartment and the kerosene compartment in the delivery wagon were adjacent and two inches apart. They opened by use of the same wrench. Several deliveries of Mobile gasoline had been made by the company between the last delivery of kerosene and the explosion. The total amount so delivered was approximately two thousand five hundred gallons. The Mobile gasoline was of brownish tinge; the kerosene white, like clear water. It is the claim of the plaintiff that from these facts the jury were justified in inferring that in drawing the ten buckets to fill the order for fifty gallons of kerosene Hansen inadvertently drew one bucket from the Mobile gasoline spigot instead of the kerosene spigot; that it is more probable that the contamination so resulted than that it resulted from the venting system of the plant which was concededly defective.

Experiments made after the explosion show that in filling the Mobile gasoline tank gasoline would overflow through the venting system of the Behling plant into the adjacent kerosene tank under certain conditions. There is no proof that such conditions existed at any time the company filled the Mobile gasoline tank between the date it filled the kerosene tank and the explosion. The fill pipe of the Mobile gasoline tank did not overflow at any such filling. While there is evidence that sometimes a bubbling or slight spraying of gasoline occurs at the opening of the fill pipe while filling the Mobile gasoline tank, there is no evidence that this occurred at any such filling. The kerosene tank was installed

about three years after the Mobile gasoline tank. No contamination of the kerosene tank had ever been discovered during this period. There had never been any overflow of the fill pipe of the Mobile gasoline tank during this period. Experiments made after the explosion showed that when gasoline stood in the Mobile gasoline fill pipe sixteen inches, gasoline would flow through the venting system into the kerosene tank. When gasoline rose in the fill pipe of the gasoline tank at ten inches of the top, one and six-tenths gallons of gasoline per minute would flow into the kerosene tank; when at two inches, two and a half gallons per minute flowed in. When the gasoline rose in the fill pipe and was shut off one-half pint ran into the kerosene tank. When the kerosene tank and its connections were tight, as they were when tested after the explosion, overflow of gasoline through the venting system would remain as in open air for fifty seconds and then the back pressure in the venting system would stop it. The fill pipes to the different tanks of the plant were all two inches in diameter. The pipes of the venting system were all three-fourths inch. Behling in measuring the fluid in the tanks before he ordered used a long stick with a graduated scale thereon designating the capacity at different heights which was inserted in the fill pipe and dropped to the bottom of the tank.

From the evidence above detailed, which includes all having appreciable bearing on the question, we are of opinion that the jury was justified in concluding that it was more probable that the contamination of the kerosene resulted from inadvertence of Hansen than from overflow from the venting system, and that it did in fact so result.

(3) Plaintiff's counsel claims that the court erred in reducing the amount assessed by the jury for pain and suffering from $2,000 to $750. In this we consider he is correct. The sufferings of the deceased as shown by the evidence were continuous and excruciating. It was impossible to relieve them

entirely with narcotics except by giving a dose that might kill. The burns extended from neck to feet. According to the attending physician "He [the deceased] was in agony, he was twisting and turning and moaning and calling for relief." He survived ten hours. He must have been apprehensive, if not certain, of impending death. The trial judge seems to have been adverse to reducing the award, but impelled to do so because, as he stated, he believed that "under the authorities in this state" he was required "to cut these damages . . . to $750." A like reduction was made by the same trial judge in *Warrichaiet v. Standard Oil Co.* 213 Wis. 619, 634, 252 N. W. 187. This court in that case had only to pass upon whether the amount of $750 was as low as a jury might properly award, which it manifestly was. The cases from other jurisdictions, stated at page 634, *supra,* show that much higher awards than the instant ones have been upheld.

However, there can be no recovery by the plaintiff of the amount by which the award was reduced. The plaintiff was given the option of taking judgment for the reduced amount or stand a new trial. Having exercised her option and taken judgment she is barred from further recovery. *Duss v. Friess,* 225 Wis. 406, 273 N. W. 547; *Krudwig v. Koepke,* 227 Wis. 1, 277 N. W. 670. A plaintiff desiring to contest a reduction of damages, when given an option to accept or stand a new trial, must reject the reduction and appeal from the order granting a new trial. *Jolitz v. Fintch,* 229 Wis. 256, 282 N. W. 87.

(2) We are of opinion that the award for pecuniary damages was excessive. The jury awarded $9,000 for pecuniary loss. The deceased was fifty-two years old. The highest amount of earnings the testimony would warrant would be $960 per annum. The cost of an annuity of $1 at his age would be $11.164 by the annuity table. Sec. 314.06, Stats. The cost of an annuity of $960 by that table would be ap-

proximately $10,700. The plaintiff manifestly would not have received all of his earnings had the deceased lived out his expectancy. The deceased left four children of ages six to sixteen years, the support of which would have fallen upon him had he lived and which now falls upon the widow. We consider that under the circumstances $7,000 is as high a sum as the jury might properly award.

*By the Court.*—The judgment of the circuit court in the action for death by wrongful act is modified by reducing the award of the jury for the item of pecuniary loss to $7,000 and reducing the judgment therein by $2,000, unless the plaintiff shall within twenty days from the filing of the remanded record file its election in writing to take a new trial on the question of damages only, in which event the court shall so order.

A motion for a rehearing was denied, with $25 costs, on May 9, 1939.