PAZDERNIK, Special Administrator, Respondent, vs. PRIDE and another, Appellants.

*April 10—June 24, 1940.*

392

For the appellants there was a brief by *A. J. O'Melia* of Rhinelander, attorney for William Pride, and by *North, Bie, Duquaine, Welsh & Trowbridge* of Green Bay, attorneys for the Standard Oil Company, and oral argument by *Mr. Walter T. Bie* and *Mr. O'Melia.*

*Earl L. Kennedy* of Rhinelander, for the respondent.

The following opinion was filed May 7, 1940:

WICKHEM, J. Defendants make two principal contentions: (1) That there is no credible evidence to sustain the finding that there was a mixture made by defendants; (2) that the negligence of deceased in pouring kerosene on a live fire was as great or greater than any negligence attributable to defendants. In view of the conclusions of the court, only the first contention will be discussed.

The following facts are either undisputed or believed by the jury upon sufficient evidence: At about 5 o'clock a. m. on March 14, 1939, Mrs. Pazdernik was fatally burned by an explosion while using kerosene to start a fire in her cookstove. The fire had gone completely out during the night, and Mrs. Pazdernik started it with wood and kerosene. She left the room for a short time, and when she returned found

that the fire was not progressing as rapidly as she desired. She then threw some kerosene on the fire and the explosion followed immediately. After the fire, tests of the contents of the gasoline and kerosene barrels in the Pazdernik garage were made, and that taken from the kerosene barrel showed a flash point indicating an illegal mixture. The first question is whether there was evidence to connect either Pride or the Standard Oil Company with delivery of the illegal mixture.

On February 25th Pride delivered fifty gallons of gasoline and five gallons of kerosene to the Pazdernik farm. Pride's gasoline truck had four compartments, numbered, respectively, 1, 2, 3, and 4. Number 4 is the back compartment of the truck. On February 24th, Pride had about one hundred gallons of gasoline in this compartment and sold it all. On February 25th, the truck started on its deliveries with compartments 1, 2, and 3 filled with gasoline and with fifty-five gallons of kerosene in compartment 4. The order for kerosene was from one Boers, who ran a garage. The gasoline was all delivered and fifty of the fifty-five gallons of kerosene were delivered to Boers. The truck returned empty except for the five gallons of kerosene in compartment 4. Upon return to the plant, three hundred gallons of fuel oil were loaded in compartments 1, 2, and 3 and delivered to a Mrs. Taylor. The kerosene compartment was not opened during the day between the delivery to Boers and delivery to Pazdernik. The Pazdernik order for fifty gallons of gasoline came during the day, and after making the Taylor delivery, Pride loaded and measured fifty gallons of gasoline and drove to the Pazdernik farm with nothing on the truck but fifty gallons of gasoline and the five gallons of kerosene remaining in compartment 4 after the Boers delivery. The delivery to Pazdernik was made by buckets, a red bucket being used for gasoline and an unpainted or white bucket being used for kerosene. The two barrels stood between

six and eight feet apart in the garage, and it was necessary to walk around a tractor to get at the kerosene barrel. Pazdernik was present at the time of the delivery of the gasoline. The gasoline was delivered first and then Pazdernik asked if Pride had any kerosene. On being told that he had about five gallons Pazdernik said he would take that amount. The kerosene was then delivered in a five-gallon bucket. Pazdernik states that he did not notice any gasoline being put in the kerosene barrel, and that he certainly would have noticed it had it been done. Further than this, since the buckets used for the purposes of delivery were five-gallon buckets, the misdelivery of five gallons of gasoline into the kerosene barrel would have produced a much greater mixture of gasoline than the test actually showed. A test of the kerosene still on hand at the Boers garage proved it to be pure, unmixed kerosene, with a proper flash point for such a product. We are, therefore, faced with the fact that the fifty-five gallons of kerosene, with which Pride started on February 25th, was pure kerosene. There is not the slightest evidence that the source of supply at the bulk plant was contaminated, and the test of the Boers kerosene indicates that this was pure, unadulterated kerosene. There is no evidence whatever that the kerosene compartment was opened between the delivery to Boers and the delivery to Pazdernik. Both Pride and Knackstedt assert, and in this they are corroborated by Pazdernik, that there was no misdelivery on February 25th of gasoline into the kerosene barrel. On that occasion the order for gasoline was delivered before any order for kerosene was given. Pazdernik states that he would have noticed if there had been any delivery of gasoline to the kerosene tank, and besides this, the introduction of five gallons of gasoline into the kerosene barrel would have produced quite a different mixture from that discovered after the fire to have been in the kerosene barrel. On the other hand, Pazdernik and his son both deny having put anything into the

kerosene barrel, and deny having done anything that could have resulted in an unlawful mixture. Both claim that the two-gallon can, which was filled from the kerosene barrel on March 13th and placed in the kitchen for Mrs. Pazdernik's use, was used for nothing but kerosene. Both deny that any kerosene was used out of the kerosene barrel after February 25th, it being claimed that the first kerosene used was that which exploded and caused the fire. A further delivery of fifty gallons of gasoline was made to the Pazdernik farm on March 7th, but there is no detailed evidence concerning this transaction.

We have given this case an unusually detailed review. Whatever the cause of the accident, the results were particularly horrible and enlist the sympathy of the court for those who have to suffer by reason of it. After a conscientious review of the facts, we discover no evidence in this case upon which to base a conclusion as to the cause of the mixture that is not a mere choice of possibilities. We are met with a situation, (1) in which the source of supply at the wholesale plant was uncontaminated; (2) in which fifty gallons of the fifty-five-gallon load were also uncontaminated; (3) in which there is no evidence of dealing with the fourth compartment between the morning delivery of fifty gallons of kerosene and the afternoon delivery of five gallons; (4) in which there is no possible room for the conclusion that there was a misdelivery of gasoline into the kerosene barrel on the occasion of the delivery. Nothing is left but possibilities,— possibilities, unsupported by any evidence, (1) that something was put into the kerosene compartment after the Boers delivery, or (2) that some small quantity of gasoline was put into the kerosene barrel on the occasion of the March 7th delivery. We see no reasonable grounds, however, for preferring these possibilities to the possibility that one of the Pazderniks, who had access at all times to both barrels, and who used both in their regular farm and home activities,

might not have returned some small quantity of gasoline to the kerosene barrel.

We are cited to two of the decisions of this court to support the jury's verdict. The first is *Warrichaiet v. Standard Oil Co.* 213 Wis. 619, 252 N. W. 187. In this case there was little question but that kerosene sold to plaintiff was from contaminated stock in the hands of the retailer. There was evidence that nobody but defendant delivered to or dealt with the retailer's supply tank. The evidence was that all of the products sold from this tank were illegal mixtures. There was, of course, the possibility of a dumping of gasoline into the tank by the retailer, but the court concluded that the verdict of the jury was in accordance with the preponderance of the probabilities. In *Nygaard v. Wadhams Oil Co.* 231 Wis. 236, 284 N. W. 577, kerosene was sold to a customer from a kerosene supply tank which was concededly contaminated by gasoline. The question was whether this contamination occurred through the overflowing of the gasoline tank into the kerosene tank or, on the other hand, by misdelivery of gasoline into the wrong tank by the Wadhams' deliveryman. There was evidence that there never had been any conditions which would lead to the overflowing of the gasoline tank, and not without some difficulty, this court held that a jury might consider it more probable that the contamination of the kerosene resulted from inadvertence in delivering gasoline to the tank rather than from overflow. These cases do not govern this case, (1) because of the uncontaminated wholesale supply; (2) the uncontaminated quality of the Boers' kerosene which was a part of the same delivery; (3) the testimony of Pazdernik himself negativing any possibility of a mistake on the occasion of the actual delivery of the gasoline and kerosene. Obviously, the mixture was caused by somebody, but it is our conclusion that plaintiff, having the burden of proof, has not succeeded in doing more than establishing a mere possibility that de-

fendants are at fault.  It follows from this that the judgment must be reversed, and the cause remanded with directions to dismiss the complaint.  All other questions become immaterial, and we see no reason for discussing them.

*By the Court.*—Judgment reversed, and cause remanded with direction to dismiss the complaint.

A motion for a rehearing was denied, without costs, on June 24, 1940.