BARNES, Special Administratrix, and another, Appellants, vs. MURRAY and others, Respondents.

*May 18—June 16, 1943.*

298

For the appellants there was a brief by *Crosby, Schneider & Esch* of La Crosse, and oral argument by *Fred W. Crosby* and *Mark F. Esch.*

For the respondents John J. Murray and John C. Rau there was a brief by *Hale & Skemp* of La Crosse, and oral argument by *Quincy H. Hale.*

For the respondent Cities Service Oil Company there was a brief by *Gordon, Law, Brody & Johns* of La Crosse, and oral argument by *Lawrence J. Brody.*

FRITZ, J.    The principal and crucial issue on this appeal is whether there was causal negligence on the part of the defendant Murray because of which plaintiffs can be held entitled to recover damages caused by an explosion and fire of a mixture of petroleum products. For the consideration

of that issue it suffices to note the following facts which were established by the evidence without conflict or dispute in any material respect. Fred C. Barnes was employed and lived, since December, 1941, as a tenant farmer on August Grams' farm, on which he had a tractor operated by using gasoline and another using a distillate. There was one underground tank for the gasoline and another for the distillate. Upon converting the gasoline tractor to use No. 1 distillate, Grams, on February 10th, ordered the defendant Rau, who was the local bulk-station agent for the Cities Service Oil Company, to remove the gasoline from Grams' underground gasoline tank and replace it with No. 1 distillate for use in the converted tractor. Rau directed Murray, who had many years of experience as a truck driver delivering petroleum products, to remove the gasoline and refill the tank with five hundred gallons of No. 1 distillate; and on February 14th Murray drove to Grams' farm to deliver the distillate. The tank, labeled "Gasoline," was round, and to pump out gasoline Murray used a length of pipe, one end of which was connected by a hose to a power take-off pump on his truck and the other end of which extended down into the underground tank. To overcome the difficulty in knowing definitely how far above the tank floor he was holding the lower end of the pipe, Murray had filed off a quarter inch of one side at that end so that when it rested on the tank floor one side of the end would be a quarter inch above the floor and suction could be maintained so that it would draw as much oil as possible out of the tank, and it could be emptied to within one-quarter inch of the bottom. Barnes was present and helping Murray at all times while he was removing the gasoline from the tank, and filling it with two hundred and a subsequent delivery of three hundred gallons of the No. 1 distillate. When Murray had pumped out as much of the gasoline as was possible he took a measuring stick and showed Barnes that there was less than an inch of gasoline on the stick, which meant that

about two and one-half gallons remained in the tank. Murray then asked Barnes if he was using the oil for anything but the tractor and Barnes replied that he was not. Murray cautioned Barnes not to use the mixture for any other purpose until he pumped out the amount that was in the tank and had it re-filled. The mixture was entirely suitable and proper for use in the tractor. After Murray left, Barnes prepared and hung a sign with the word "Distillate" on the pump of the tank in question. There was no proof that there was any custom to use the distillate for starting fires or for any other purpose than as tractor fuel.

Barnes was in the habit of buying kerosene in a five-gallon can and pouring some into a small tomato can to saturate corncobs over night for use in starting his kitchen-stove fire in the morning. During the week the distillate was delivered he ran out of kerosene and pumped about two gallons of the mixture from the underground tank into his five-gallon can, which he placed on the back porch of the house. After starting the fire in the stove and doing some outdoor chores, on February 28, 1942, Barnes, in order to replenish the supply of kerosene in the tomato can, placed it and the five-gallon can on the floor in front of the kitchen stove. Then, as he started to pour from the five-gallon can into the tomato can, there was an explosion in the five-gallon can, which blew out the bottom thereof and started a fire which caused burns on the body of Fred Barnes from which he died, and also injury to Pearl Barnes while she was attempting to extinguish the fire.

Tests made after the explosion of the petroleum mixture in the tank in question showed the flash point thereof to be 109 degrees Fahrenheit. Plaintiffs contend that the mixing by Murray of the five hundred gallons of distillate with about two and one-half gallons of gasoline left in the tank, after pumping out as much as was possible, constituted negligence *per se* because the mixture, with a flash point less than 115

degrees Fahrenheit, was in violation of the provisions in subs. (2) and (3) of sec. 168.04, Stats., that—

"(2) Any petroleum product designated by name or reference 'kerosene' shall meet the following specifications: (a) The flash point by means of the Tagliabue closed cup shall not be less than 115° F. . . . .

"(3) Any petroleum product meeting the specifications set out in subsection (2) of this section shall, for the purposes of this chapter, be classified as kerosene. . . ."

That contention cannot be sustained. The provisions in sub. (2) are applicable only when a petroleum product is "designated by name or reference 'kerosene.'" When such product is so designated "kerosene" then its flash point shall not be less than 115 degrees Fahrenheit. But under the terms used in the statute, that inhibition is not applicable to petroleum products, which were not designated "by name or reference" as "kerosene." Consequently, as there was no designation as "kerosene" of the "gasoline" left in the tank, or of the "distillate" ordered by Grams and delivered as such by Murray, or of the resulting mixture of the petroleum products in the tank, which was intended by all concerned, including Barnes, to be used as distillate,—and not as kerosene,—in operating the tractor, for which the mixture was entirely suitable and proper, there was no violation of the statute, and consequently no negligence *per se,* as contended by plaintiffs.

Neither can it be held, in view of the facts conclusively established herein, that there was any actionable negligence on the part of Murray in putting the distillate into the tank in which there remained the small amount of gasoline, after having pumped out as much as was possible. Because the resulting mixture was, to the knowledge of Barnes as well as Murray, to be used only for operating the tractors, the facts herein differ materially from facts in such cases as *Delap v. Liebénson,* 190 Wis. 73. 208 N. W. 937; *Warrichaiet*

*v. Standard Oil Co.* 213 Wis. 619, 252 N. W. 187; *Pazdernik v. Pride,* 235 Wis. 391, 291 N. W. 798; and *Waters-Pierce Oil Co. v. Deselms,* 212 U. S. 159, 29 Sup. Ct. 270, 53 L. Ed. 453, in which defendants, in selling and delivering kerosene, ordered and intended to be used as such, negligently permitted it to become mixed with gasoline. As the mixture of the petroleum products, in the case at bar, was neither dangerous nor likely to cause injury when used for the specified purpose of tractor fuel, there was no basis or occasion for Murray to anticipate that Barnes would use some of it for lighting fires. That is particularly true in view of the facts that Barnes assured Murray he was not using the oil for anything else than the tractor, and that Murray cautioned him not to until he had pumped out the amount in the tank and it was filled up again. In that crucial respect, this case differs materially from the cases cited above in which a mixture containing some gasoline was sold as kerosene with knowledge on the part of the vendor of the custom to use kerosene for building fires. Because the evidence does not admit of finding that Murray ought reasonably to have foreseen or anticipated that Barnes was apt to use the mixture to build a fire, there is not established the essential element of reasonable anticipation which is necessary in order to constitute actionable negligence. "Negligence in law is not mere carelessness, but is careless conduct under such circumstances that an ordinarily prudent person would anticipate some injury to another as a reasonably probable result thereof." *Johanson v. Webster Mfg. Co.* 139 Wis. 181, 184, 120 N. W. 832; *Osborne v. Montgomery,* 203 Wis. 223, 234, 234 N. W. 372.

*By the Court.*—Judgment affirmed.