SCHWALBACH and wife, Plaintiffs and Respondents, v. ANTIGO ELECTRIC & GAS, INC., Defendant and Respondent: INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION, Defendant and Appellant.

*April 30—June 1, 1965.*

652

For the appellant there was a brief by *Smith, Puchner, Tinkham & Smith* of Wausau, and oral argument by *Richard P. Tinkham.*

For the respondents Lawrence and Gertrude Schwalbach there was a brief by *Graunke & Boone* of Wausau, and oral argument by *Walter A. Graunke* and *Clinton A. Boone.*

For the respondent Antigo Electric & Gas, Inc., there was a brief by *Schmitt, Wurster, Tinglum & Nolan* of Merrill, and oral argument by *Sverre Tinglum.*

BEILFUSS, J. The principal issue is whether the credible evidence is sufficient to sustain the jury findings (1) that a malfunction of the pilot relay caused the explosion, and (2) that International was negligent in the manufacture of the pilot relay.

International also contends that the verdict is inconsistent insofar as it found Antigo negligent as to inspection of the pilot relay but not causally so, and that the answers to damage questions cannot be sustained because of the insufficiency of the proof and erroneous ruling as to admission of evidence.

In testing the sufficiency of the evidence to sustain a jury verdict, the following rules apply:

"When a jury verdict is attacked we inquire only whether there is any credible evidence that, under any reasonable view, supports the verdict. This is especially so when the verdict has the trial court's approval." *Cheetham v. Piggly Wiggly Madison Co.* (1964), 24 Wis. (2d) 286, 290, 128 N. W. (2d) 400.

"When several inferences may reasonably be drawn from credible evidence, one of which will support a claim of one

of the parties and the other inferences will not, it is for the jury to determine the proper inference to be drawn from the conflicting evidence. Although we could sustain a contrary result if found by the jury, it is our duty not to set aside a verdict when it is approved by the trial court, as here, and when there is credible evidence to sustain it." *Dickman v. Schaeffer* (1960), 10 Wis. (2d) 610, 616, 103 N. W. (2d) 922.

A companion and qualifying rule is that a verdict cannot stand on conjecture, unproved assumptions, or mere possibilities.[1]

While we have reviewed the entire record we report only such facts that support or tend to support the verdict under the rules stated above.

We first consider the issues involving the explosion.

In 1961, Antigo sold and installed a Coleman gas furnace for the plaintiffs in the basement of their farm home in the village of Eland, Shawano county, Wisconsin.

The furnace was designed to use liquid petroleum gas (heavier than air), which was supplied from a storage tank located in the yard. It came equipped with a pilot relay. A pilot relay is an electrically operated safety device. Its function is to shut off the supply of gas when the pilot light is not burning.

Two valves are principally involved—one is a manually operated valve that can shut off the gas at its source at the tank—the other is an automatic valve that controls the flow of fuel to the burner pot of the furnace. If the room

[1] *Wadzinski v. Cities Service Oil Co.* (1957), 275 Wis. 84, 80 N. W. (2d) 816; *Arledge v. Scherer Freight Lines, Inc.* (1955), 269 Wis. 142, 68 N. W. (2d) 821; *DeWitz v. Northern States Power Co.* (1955), 269 Wis. 548, 69 N. W. (2d) 431; *Fonferek v. Wisconsin Rapids Gas & Electric Co.* (1954), 268 Wis. 278, 67 N. W. (2d) 268; *Pazdernik v. Pride* (1940), 235 Wis. 391, 291 N. W. 798; *Pinter v. Wenzel* (1920), 173 Wis. 84, 180 N. W. 120; *Quass v. Milwaukee Gas Light Co.* (1919), 168 Wis. 575, 170 N. W. 942.

temperature is below the thermostat setting this valve automatically opens and fuel is supplied to the burner; when the room temperature reaches the thermostat setting, the valve automatically shuts off. If (for a variety of reasons) the pilot light is not burning and room temperature is below the thermostat setting, the automatic valve would open and fuel would run into the burner or fire pot and eventually overflow, creating a dangerous condition because of the combustible character of the fuel.

The function of the pilot relay is to prevent this situation. It is to shut off or close the automatic valve when the pilot light is out. The pilot light is supposed to be burning at all times except when intentionally extinguished. The pilot relay acts only when the pilot light is out. Adjacent to the pilot light is a thermocoupler. The pilot light supplies continuous heat to the thermocoupler. If the pilot light is not burning the thermocoupler then cools and transmits an electrical impulse to pilot relay. It breaks a contact in the pilot relay which then in turn closes the automatic valve and cuts off the supply of fuel to the burner.

Between the installation in May, 1961, and the explosion in October, 1963, Antigo made several service calls to plaintiffs' home to check the furnace.

In April of 1963, Antigo, in response to a service call, replaced the pilot relay on plaintiffs' furnace with one taken from a demonstrator furnace in Antigo's showroom. This pilot relay was manufactured by General Controls in 1959 and was mounted on a Coleman gas furnace. In the showroom the pilot relay had been demonstrated five or six times and functioned properly on each occasion.

In June and July, 1963, plaintiffs called Antigo and complained of a smell of gas. Antigo checked all the lines for leaks and found none. The pilot relay was not checked after it was installed in plaintiffs' home.

In October, 1963, a violent explosion in the basement demolished the plaintiffs' home and their furnishings.

The day after the explosion an employee of Antigo, a Professor Harrison, and others went to the scene of the explosion to determine the cause of the explosion. It was found that the pilot relay was not functioning. The pilot relay was removed from the furnace. An examination revealed that the contact points were not in a position to shut off the valve supplying fuel to the furnace.

Professor Harrison is an associate professor of mechanical engineering at the University of Wisconsin. He is a registered engineer. He has taught courses relating to the design of automatic controls and worked for a company manufacturing automatic controls. He has coauthored two books on automatic controls. These texts are widely used. He does research and consultation work, and has been a consultant in respect to accidents involving automatic controls.

Professor Harrison testified that he tested the pilot relay electrically both at the scene of the explosion and at his office and found it was closed and not operating as a safety device. It was his opinion that it was not damaged in the explosion. The relay is a sealed unit with the seal intact at the time it was examined. It did not bear any marks or evidence to indicate it might have been mishandled or damaged in the explosion so as to cause it to malfunction. He further testified that a nonfunctioning pilot relay can create a highly dangerous situation because of the explosive characteristics of the liquid gas. It was his opinion that the pilot relay was faulty in design in that it did not have a "window" for visual inspection and that it was faulty in its manufacture because of not enough clearance between the contact points (it had a clearance of 40/1000 of an inch—Harrison stated he would not design or approve

one with less than 20/1000), and that the pin to push the points apart was too short.

Harrison then testified that in his opinion his investigation revealed that other possible causes of the explosion were eliminated; that the pilot relay was not functioning and was the cause of the explosion. It was his further opinion that the pilot relay was faulty when it left the factory and that it never worked properly. When confronted with the testimony that this pilot relay had worked properly in demonstrations in Antigo's showroom, he receded from his opinion that it did not function properly when it left the factory but adhered to his opinion that it was not functioning prior to the explosion and caused the explosion.

A Mr. Laurence Biggle, an employee of International, was called as an expert witness. For many years he has designed and tested automatic gas controls. It was his opinion that the pilot relay was properly tested and approved before it left the factory, that it could have been damaged in the explosion and that the explosion could have been caused by other gas leaks in the system. The main gas valve was disassembled. Some small foreign particles were found under the diaphragm. Biggle testified this could cause a gas leak—Harrison said it would not.

The jury could accept or reject the testimony of the experts. The credibility of the witnesses and the weight to be given their testimony was within the province of the jury.

Mr. Biggle did not express an opinion as to what specifically caused the explosion but rather testified as to ways it could have happened.

International contends that Professor Harrison's opinions were based upon assumptions that were either not established or demonstrated not to be true.

A review of the record reveals that Professor Harrison did not deviate from his opinion that the pilot relay was not properly manufactured as a safety device, that its design

was inadequate for visual testing, that the pilot relay malfunctioned prior to the explosion, and that it was the cause of the explosion. While he did concede that the pilot relay functioned in the demonstrations, he did not concede that the method of testing was adequate or complete.

Professor Harrison's testimony if accepted by the jury, together with the testimony of Antigo's employees that they checked the system on several occasions and had never found a leak in any other part of the system, is sufficient credible evidence to permit an inference that the pilot relay did not function properly before the explosion and was the cause of the explosion. Upon this evidence they could further find that the pilot relay was manufactured in a negligent manner.

In *Ryan v. Zweck-Wollenberg Co.* (1954), 266 Wis. 630, 636, 64 N. W. (2d) 226, this court stated:

"It is a definitely settled principle of law in this state that a manufacturer who places a manufactured article in trade and commerce not inherently, but because of its negligent construction, imminently dangerous to life and limb, is liable to one who sustains injuries by reason of such negligent construction. *Flies v. Fox Bros. Buick Co.* (1928), 196 Wis. 196, 207, 218 N. W. 855; and *Marsh Wood Products Co. v. Babcock & Wilcox Co.* (1932), 207 Wis. 209, 223, 240 N. W. 392."

International contends that the verdict is inconsistent in that the jury found Antigo negligent as to inspecting the pilot relay and then found this negligence was not a cause. Antigo does not challenge the jury's finding of negligence but maintains that its negligence was not causal.

Antigo did not check the pilot relay to determine whether it was working properly when it was installed in April, 1963, nor any time thereafter when they were called for service. Harrison testified the pilot relay could have ceased to operate properly at any time between the installation in

April and the explosion in October. Mr. Duff, Sr., the principal officer of Antigo, testified that he had replaced several (about 50) pilot relays on Coleman gas furnaces throughout his twenty or more years in the business and that a pilot relay could operate all right when checked and fail to work one-half hour later. This testimony, if accepted by the jury, coupled with the fact that a visual inspection was impossible was sufficient evidence to permit the jury to find that the negligence in failing to check the pilot light would not have revealed a malfunction and was not a substantial factor in producing the explosion.

The jury found the plaintiffs' damages to be (a) house—$7,500, (b) furniture, household furnishings, and appliances—$4,000, (c) loss of use of the house—$875, (d) demolition of house and cleaning up debris—$1,425, and (e) loss of food and canned goods—$300.

International challenges the jury award for the house, furniture, household furnishings, and appliances and for the loss of use of the home.

The Schwalbach home was built in 1901 with an addition to it about twenty years later. Subsequent additions (a glassed-in porch), repairs, and renovations were made by the plaintiffs. The home was modernized, well kept, and in good repair. In the ten years immediately prior to the explosion the plaintiffs had expended about $5,600 in renovation and repair of the house.

Two real-estate brokers who were qualified as appraisers testified in behalf of the plaintiffs. A Mr. Wendorf testified the house had a fair market value of $9,700 before the explosion and no value after the explosion. He based his opinion upon cost of replacement less a 25 percent depreciation. A Mr. Nuske testified the fair market value was a replacement cost of $12,900 less 25 percent for depreciation. Neither of these expert witnesses considered comparable sales in arriving at their opinion. Expert witnesses for the

defendants did consider comparable sales and testified to substantially lower values.

The trial court properly instructed the jury as to the definition of "fair market value" as the price arrived at between a willing but not obligated buyer and seller. The replacement-cost-less-depreciation method of determining fair market value is commonly used and is permissible. The value arrived at by this method is not conclusive but is evidentiary and, together with other evidence, can be considered by the jury in arriving at their finding of fair market value. The jury award of $7,500 for the loss of the house is within the credible evidence and must be sustained.

A part of the furniture of the plaintiffs was inherited by Mr. Schwalbach. Most of the furniture, furnishings, and appliances were purchased new by the plaintiffs over a period of years. The cost of these items new was in excess of $6,000.

Wendorf testified that in his opinion the fair market value of these items was $5,000 before the explosion and no value after. On cross-examination he stated that in this instance replace value and fair market value were the same. Upon further cross-examination and examination by the court as to the definition of "fair market value," he revised his opinion and then testified the furniture and appliances had a fair market value of $2,300. Mr. Nuske testified in much the same manner and likewise revised his opinion of fair market value to be $2,300. Again witnesses for the defendants testified to lower values based upon second-hand furniture sales. The jury found the loss for this personal property to be $4,000. The trial court rightfully concluded that evidence did not sustain this finding and reduced the award to $2,300. We find no abuse of discretion by the trial court in reducing the award to this amount and this order of the trial court is approved.

The evidence in the record as to the loss of use of the home reveals only the following: The plaintiffs testified that they purchased a used trailer home, placed it upon the premises and used it as living quarters while the house was being rebuilt. The cost of the trailer was $1,005 and it had or would have, at such time as the house was completed, a resale value of $800. The installation costs for electrical and telephone service was $69.80. Upon this evidence the jury found the loss of use to be $875.

The proper measure of damages for loss of use of the dwelling house in this instance is an amount equal to the fair rental value of a house of like kind and quality in the area of Eland for such length of time as was reasonably necessary to reconstruct a house comparable to the one destroyed, plus the reasonable value of necessary incidentals occasioned by moving.

The evidence in the record does not meet this measure of damages. While the evidence offered may have some evidentiary value it is not sufficient to sustain the award of $875. The order of the court and judgment rendered insofar as it allows a recovery of $875 for loss of use of the house is reversed and a new trial is awarded on this single issue. We are reluctant to order a new trial limited to this relatively minor issue but we feel compelled to do so. It is our hope that this issue can be negotiated and adjusted by the parties before the retrial.

International contends the trial court erred in refusing to admit into evidence an application for insurance (Exhibit 33), signed by Mr. Schwalbach, wherein he stated the value of the house was $2,500 and the furniture was $1,500 as an admission against interest. The trial judge in ruling on the admissibility of the exhibit stated that the application for insurance did not necessarily constitute a statement or opinion of value, that anyone can insure his property for any amount less the actual value if he so desires. He opined that

if the exhibit was a proof of loss it would be a statement of value and admissible, but that an application for insurance for a stated value did not bind nor necessarily indicate the applicant's opinion as to value and as such was not an admission against interest. We agree. It was not error to exclude the exhibit.

*By the Court.*—Judgment reversed, and new trial ordered on issue of damages for the loss of use of the house. Judgment in all other respects affirmed. Costs allowed to respondents.