HELLERMANN, Appellant, vs. HELLERMANN, Respondent.*

*June 5—June 22, 1946.*

* Motion for rehearing denied, without costs, on September 28, 1946.

*Walter D. Corrigan, Sr.,* of Milwaukee, for the appellant.
*Carl R. Becker* of Milwaukee, for the respondent.

Fritz, J.   The plaintiff, Arthur K. Hellermann, appealed from the provisions in a judgment of divorce in relation to the temporary custody of the two sons of the parties, and also from a subsequent order awarding the custody to the defendant, Elisabeth Hellermann.   The parties were married July 20, 1934, and the ages of their sons are five and seven years, respectively.   After plaintiff commenced this action on November 18, 1944, the children continued in defendant's custody until July 6, 1945, when plaintiff, without the knowledge of defendant took them away while they were playing outdoors and kept them until, during proceedings in court in relation to their custody, it was stipulated they could be temporarily in the custody of Gustave P. Utke and his wife, subject to opportunities for the parents to visit with the children.

On the trial there was an extended and bitter contest in relation to the issues as to the grounds for divorce alleged by plaintiff, and as to the custody of the children, and their and the defendant's physical and mental condition and her fitness to have such custody. Upon our review of the evidence and all proceedings herein it is apparent that no useful purpose will be served by stating in detail or any extended discussion of the evidence upon which the trial court's decisions are based. The only finding by the court as to a ground for granting the divorce is—

"That the defendant has been guilty of a course of cruel and inhuman treatment toward the plaintiff in that she on various occasions threatened to commit suicide, thereby causing a great nervous strain upon the plaintiff and adversely affecting his health."

The court's statements in the course of its decision on November 29, 1945 (pursuant to which that finding was prepared), were as follows:

"I have listened to three and one-half days of testimony, and you told me nothing the average husband and wife couldn't tell after living together eleven years. . . . I don't think Mrs. Hellermann starved those children or unduly neglected them. The ground on which I am granting the divorce are cruel and inhuman treatment. The only specific act of cruelty and inhuman treatment I can find is . . . the repeated suggestions to her husband that if she wasn't considering suicide, at least she was worried about the possibility. She kept him home from his work a number of times and made it extremely difficult for him to practice law as a man should. I believe that sufficient cruel and inhuman treatment to justify the granting of a divorce."

"I hesitate to grant one (divorce). I believe it is stretching a point and stretching it considerably, to find cruel and inhuman treatment. Of course, I know what you thought, and that is that the emotional strain Mrs. Hellermann was under caused her to do the things she did. Your claim is that the treatment given her by her husband created the situation.

That's possible, but if we go too far in this, we end up with no grounds for divorce. I think it is better here for everyone concerned that a divorce be granted."

Mr. Becker: "Then the court's findings of cruel and inhuman treatment are limited specifically to those enumerated and enunciated?"

The Court: "That's right."

"I am of the opinion, however, that the threats—you could hardly call them threats—the repeated statements on the part of the wife that—not that she was considering suicide, but that the possibility of suicide was imminent. Her own admissions that she requested her husband to stay home on various days, so he would be there to help her prevent doing anything drastic, such as committing suicide, could be such cruel and inhuman treatment as to entitle Mr. Hellermann to a divorce. I'll grant a divorce to him on the grounds of cruel and inhuman treatment."

As neither the court's findings and decision in those respects, nor the provisions in the judgment granting the divorce thereon, are questioned on this appeal, there is no occasion to discuss them, excepting as the matters stated may be involved in the review of the court's rulings in relation to the final award of the custody of the children to the defendant.

On that subject the court, in the course of its decision on November 29, 1945, stated:

"I don't place a great deal of weight on the testimony given in regard to the malnutrition of the children. I get the impression that they were fed as ordinary children are. Unfortunately, they had tonsilitis and some other diseases of childhood. . . . I don't think Mrs. Hellermann starved those children or unduly neglected them."

"Ordinarily children four and six years of age should be left with the mother. At this time I, frankly, don't know the condition of health of the mother. We have heard testimony on that, that she is in good health. I get the impression from watching her testify and from conferences in chambers that she is highly emotional at this time and nervous—much of which is undoubtedly brought on by this trial and perhaps by

the unhappy marriage. However, I have no way of knowing that. I don't think the children should be turned over to the custody of the mother—at least not at this time. They apparently are getting excellent care at the Utkes, but that isn't the ideal situation in view of the fact that she and the Utkes have not been getting along too well. Although, from watching the children and Mrs. Hellermann in chambers yesterday, I get the impression that feelings weren't very bitter between her and Mrs. Utke. The children seem to like Mrs. Utke and appear to be well-mannered and well-fed and well-behaved boys, which would indicate they are getting good care. I think the children should be left at the Utkes for the time being. However, at the end of six months if Mrs. Hellermann cares to submit to an examination by two doctors, or one, or three, whatever the attorneys agree upon—doctors agreeable to the attorneys, and I will suggest there will be more than one—and if they pronounce her physically and emotionally fit to care for the children at that time, after she has had a chance to recuperate, then I will be glad to entertain a motion to have the children turned over to her. . . . I don't believe, for the good of the children, that they should be taken out of the home. If they are taken out I think they should be taken out permanently. When you can convince this court that Mrs. Hellermann is in good health again, then I'll entertain a motion to have them turned over to her. I don't think she is in the best of health yet. That may be because of the strain of the lawsuit and the strain of marital difficulties. Six months isn't too long."

In accordance with those statements, the court made findings of fact and conclusions of law, and judgment was entered which gave the temporary custody of the children to Mrs. Gustave P. Utke, with the right of visitation by each of the parents at all reasonable times,—

"with the right of the defendant to take the children out on alternate Saturdays and Sundays, commencing with the first Saturday in December, 1945; and the plaintiff to have said children on alternate Saturdays, commencing on the second Saturday of December, 1945; . . . and that the temporary custody of the said children remain in Mrs. Utke until Friday,

March 1, at 10 o'clock a. m., at which time the defendant shall be prepared to submit competent medical testimony as to her emotional and physical condition. If the defendant at said time shows to the court that she is emotionally and physically normal, then the custody of the said children shall be removed from Mrs. Utke and placed in the said defendant."

And the judgment expressly provided: "That the question of custody of the said children is adjourned until March 1, 1946, at 10 o'clock a. m., with absolute custody and control in Mrs. Gustave P. Utke until that time. . . ."

No review is now sought in respect to those provisions. In accordance therewith the children remained temporarily in the custody of Mrs. Utke and the right of visitation was apparently exercised by each of the parents.

Under the provision adjourning until March 1, 1946, there was a further hearing on the question of the custody of the children on the 13th to the 17th of April, 1946. A number of witnesses, including the parties, testified as to incidents which occurred, and the children's and defendant's conduct while they were with or in her presence, and also witnesses' observations as to the physical and mental condition of the children and the defendant. And in relation to her condition in those respects, and particularly her stability and capability to have the custody and care of the children, there is also in the record, in addition to testimony given at the prior hearing in November, 1945, by Dr. Paul J. Purtell that—

". . . as far as her present stability is concerned, I know nothing about that. The only thing I can testify to is the last time I saw her which was in October, 1944. Then it was not safe to leave the children with her"—

testimony to the following effect given at the April, 1946, hearing by five physicians, to wit,—

Dr. Frederick W. Madison testified that Mrs. Hellermann came under his professional care on July 13, 1943. She consulted him because of a history of anemia; second, nervous-

ness and depression; third, a painful right shoulder. He treated her for those conditions. Prescribed nerve sedative and rest and advised that her blood count be repeated after a period of two or three months. He made the last examination on June 14, 1945, and found her physical condition to be normal except for a slight inflammation in the pelvis. He testified: "I would say that she is physically capable of taking care of the children."

Dr. Edward D. Schwade testified that since 1932 he limited his practice to nervous and mental diseases. He examined Mrs. Hellermann on March 11, 1946, at his office. It was a psychiatric examination and included an entire physical and mental examination, and evaluation and survey. He found defendant was entirely normal physically and mentally, and was emotionally sound and mentally stable. There was no disturbance of intellect. Her contact with reality is good. Her responses are alert and bright and normal. He found no evidence of delusions or hallucination, and no abnormal traits of character that were demonstrable. No evidence during his examination of abnormal swings and moods. He found elation or depression within normal limits, and examined her concerning her feeling and affection toward her children. On cross-examination he testified: "Assuming that Mrs. Hellermann has on various occasions threatened to commit suicide, I am still of the opinion that she is emotionally stable. That fact would have nothing to do with the expression of my opinion as to her stability at all."

Dr. Andrew I. Rosenberger testified he limited his practice to nervous and mental diseases. He examined defendant on February 20, 1946, and again on February 23, 1946, and saw her again the day Dr. Schwade examined her. His examinations included a mental evaluation and physical survey and an emotional investigation. He found no wrong in the lady. "There is no disturbance of intellect. She is in excellent contact with reality and her responses at all times were prompt and relevant, without the slightest evidence of delusions or hallucinations. Physical condition is excellent. Emotionally she is pleasant, co-operative, without any evidence of abnormal traits of character. No evidence of abnormal swings and moods; neither depressed nor elated." He found her quite stable emotionally. "As to her emotional condition last October and November, 1945, I am of the opinion that she

was probably quite upset emotionally prior to the granting of the divorce. . . . I haven't observed anything from the time of my examination up to today that would change my opinions. I see no reason why this woman should have any more emotional upsets unless there is some sufficient aggravating external stimulus to produce such a thing. . . . I would assume this lady was in the same emotional state on March 24, 1946, as I found her on February 20, 1946, and as I observed her today. My evaluation of her would definitely disclose whether she is subject to moods of depression at certain times. As to whether in anger she might be raging for a whole day, I don't believe that she is the type that would do that unless she was subjected to some very severe form of psychic trauma. If the evidence establishes that she was raging for a day, in the absence of any psychic trauma I would want to know the whole story in relation to that period before that would change my opinion."

Dr. William F. Lorenz,—who, with Dr. Fitzgerald, had been selected by plaintiff to make an examination of defendant to which she had been ordered by the court to submit, and who made a report of their joint examination, and who was called as a witness on behalf of plaintiff,—testified that he specialized in nervous and mental diseases. He made a psychiatric examination of defendant around March 9th, together with Dr. Fitzgerald. He found her to be normal mentally; discovered no psychosis. He had previous information from plaintiff as to some outstanding incidents in her life, and those were brought up; and the method was to observe her and observe her reactions, and of course take into account her replies. He had a sufficient examination and an opportunity for an examination to arrive at an opinion as to her mental condition. His "opinion as to her mental condition based upon that examination at that time is that she is normal. That type of examination would necessarily disclose an emotional instability, if she showed any emotional instability during the process of the examination. It is possible that one would not by that method of examination, or that opportunity, be able to judge completely as to a person's emotional stability under all possible situations."

Dr. Elizabeth Kane, who also was called as a witness on behalf of plaintiff, testified primarily of her examination of the children; but she also testified as to an incident or flare-up

of defendant at her home while Dr. Kane and Mrs. Utke were there for about ten minutes on March 24, 1946. Mrs. Utke came there to call for the children who had been visiting with defendant. Dr. Kane testified that after the children went out to the automobile with Mrs. Utke defendant asked Dr. Kane why she was seeing the children; and that she replied, "I was seeing them because I was asked to determine whom they would be happiest with—where they would be most secure." Dr. Kane testified she then "observed violent rage in Mrs. Hellermann. She became so angry that she seemed to lose much reality of what she was doing. She wrung her hands, paced to and fro and had a look in her eye similar to that that I have seen only in a few of my patients. She was so angry that I was quite anxious about her. I was afraid she would attack me. I was apprehensive because of the way she glared at me—because of the accusations that she was making, of Mr. Hellermann, and directed against me for being present. . . . I told her I came there entirely about the children, and that I had no intention of doing anything except seeing the children. With that she calmed down somewhat. . . . She asked me to forget it. . . . That was the extent of the rage that was beyond normal. In my opinion as a psychiatrist . . . I say beyond normal because of the way she wrung her hands, the way she paced to and fro, but primarily the look in her eyes. I'm used to watching my patients' eyes. From the expression on her face, she was not conscious of what she was saying. She was so angry that she was talking without thought. This rage continued possibly ten minutes. I said nothing there at all, so far as I can determine, to cause her to fly into that rage; quite the reverse. Nobody else said or did anything there to cause that rage as far as I could see or hear. Her condition at that time was very different from the condition I had observed her in that morning at the Sunday school. In the morning I would have said she was an anxious, nervous mother—emotional and tense, but perfectly average emotionally for the situation in which she found herself. In the evening I would not have said so. In the morning I would have said exactly what the psychiatrist said earlier this morning."

In relation to that "flare-up," the court said, in its final decision at the conclusion of the hearing,—

"I might say this in regard to the argument or the fight which was had in the home of—in the Wood home. I don't believe there is anything unusual about that. You have an expert of child psychology come in and inform her that she is going to look her over and look over the children, and that she is going to advise the court where the children should be. I don't believe there is anything unusual about a woman losing her temper in that case."

In the course of that hearing, which resulted in ordering that the custody of the children be awarded to defendant with rights of visitation on the part of plaintiff, the court also stated the following:

"I gather from your questioning that you assume the court felt the threats of suicide were the result of a mental condition. If I had so found, I could not have granted a divorce. If I thought this woman were mentally unstable and as a result of that she threatened suicide, that would not have been grounds for divorce. I had to of necessity find those threats of suicide were deliberately made for the purpose of irritating her husband. Having so found, I found it would constitute sufficient cruel and inhuman treatment at that time. At the time she was in court I thought she was extremely nervous, and I didn't know what her condition was. I felt the children should not be given to her at that time. There has been no finding on the court's part that this woman was mentally unstable. If there had been, I would have appointed a guardian and, undoubtedly, would have refused a divorce."

"I found this woman took good care of the children while she had them. They were fed properly; that there was nothing morally wrong with her; that the only question before the court was to determine whether she was normal as of today physically and emotionally. . . . I have previously determined . . . that the mother was entitled to the custody of the children if she could show she was physically and emotionally able to care for them as of now. . . . I have previously found there was nothing morally wrong with this woman, and the care she gave was O. K. At the time of the trial she seemed upset, and I didn't want to turn the children over to her at that time. This hearing today is to be restricted solely to medical testimony unless, of course, you have got

witnesses who have seen something which would definitely indicate there was something wrong with her emotions."

The order finally made on April 17, 1946, and from which plaintiff appealed, provides:

"That the custody of the children in question, namely, William and Thomas Hellermann, be awarded to Mrs. Hellermann, with rights of visitation on the part of Mr. Hellermann" at specified times and under conditions which are stated with details as to which there is no controversy on this appeal.

After careful review and consideration of the evidence and proceedings and counsel's contentions in relation thereto, we are convinced that findings of fact, conclusions of law and judgment, and the subsequent order of April 17, 1946, awarding the custody of the children to defendant, and also the statements noted above, which were made by the court in deciding matters during the course of the proceedings, are warranted under the evidence in this case. In view of the testimony of the four eminent physicians as to the normal physical and mental condition and stability of the defendant in April, 1946, a finding to the contrary, if it had been made by the court, would clearly be against the great weight and clear preponderance of the credible evidence, and could not be sustained on an appeal. From the careful and deliberate manner in which the trial judge conducted the proceedings and adjourned for several months the hearing and final determination of the issues in relation to the ultimate custody of the children in order to have further proof as to defendant's stability and capability, it is evident that he had the right conception of the law and was earnestly endeavoring to apply the principles that the welfare of the minor children is now the controlling consideration; that the result reached should subserve the best interests of the children; and that with regard to children of tender years, preference will ordinarily be given to the mother, other things being equal and she not being unfit.

*Jensen v. Jensen,* 168 Wis. 502, 504, 170 N. W. 735; *Acheson v. Acheson,* 235 Wis. 610, 294 N. W. 6; *Elies v. Elies,* 239 Wis. 60, 67, 300 N. W. 493. Consequently, as there was ample credible evidence to establish that the defendant was capable and not unfit to have the custody of the children; and as it appears that she can have them reside with her where they would be under her immediate care and supervision instead of with strangers in blood, the order of April 17, 1946, should not be disturbed. *Elies v. Elies, supra.*

Appellant also contends the court erred in certain rulings sustaining objections to the admission of evidence which plaintiff sought to introduce, and also rulings excluding testimony which had been introduced. Upon due consideration of the rulings in question there does not appear to be any error which can be deemed prejudicial or otherwise of such nature as to entitle plaintiff to reversal of the judgment or the order under review.

*By the Court.*—Judgment and order affirmed, and all stays of execution heretofore granted are hereby vacated.