POLLOCK, Respondent, vs. POLLOCK, Appellant.

*May 3—June 5, 1956.*

236

For the appellant there were briefs by *Godfrey & Godfrey* of Elkhorn, and oral argument by *Alfred L. Godfrey.*

For the respondent there was a brief by *Kenney, Korf & Pfeil* of Elkhorn, and oral argument by *Richard H. Pfeil.*

STEINLE, J.   The principal questions raised upon this appeal are as follows:

Did the court abuse its discretion in awarding the custody of the minor child of the parties to the respondent, Audree Pollock?

Is the order of the court divesting respondent of the custody after August 31, 1960, invalid?

Was the trial court without power to adjudicate alimony in this action, the Washington court's divorce decree being silent as to alimony?

In view of the Washington decree of divorce, is the respondent barred from obtaining an order for attorney fees for services rendered on her behalf in an action brought by her in this state to obtain the custody of the child?

Was the trial court without power to direct a contribution by the appellant toward the respondent's attorney fees and expenses upon this appeal?

The record discloses that in June, 1955, when this action was tried, the parties were twenty-five years of age, respectively. Kenneth Pollock met Audree in 1949 while he was in the service of the United States naval air force and was stationed on Whidbey Island, located about 90 miles south of Vancouver. Audree lived and worked in Vancouver. Shortly after the marriage of the parties in April, 1951, Kenneth was detailed to accompany his naval outfit on maneuvers in the vicinity of Whidbey Island, Alaska, and Okinawa. While so engaged in the summer of 1951, he became stricken with polio. He was hospitalized at Okinawa and at Oakland, California. At first his condition was diagnosed as encephalitis, but several months later medical authorities of the navy changed the diagnosis to poliomyelitis. In September, 1951, he was transferred to the Bremerton naval base where he was confined as an inpatient until July, 1952, and during part of which time he was almost completely paralyzed. After Kenneth was released from the hospital as an inpatient, the parties lived together with the child at Bremerton until June 22, 1954. They occupied a residence in which they acquired an equity. The wife, in addition to performing her household duties, caring for the child, and partially nursing her husband, at times had gainful employment away from the home. The husband had been an outpatient at the hospital for a considerable time after his release from there as an inpatient. After his physical condition had bettered, he began to drive an automobile and took Audree to and from work. In September, 1953, he entered a university at Seattle. He commuted by automobile from Bremerton to Seattle, a distance of 12 miles, partly by ferry, to attend his classes. He continued as a student at the university until he left for Whitewater, Wisconsin, on June 22, 1954. He did not return to the state of Washington thereafter.

On June 22, 1954, at about 10 a. m., Kenneth drove
Audree to her place of employment. He agreed to call for
her at 6 p. m., when she finished work. However, he failed
to appear. Upon her return to the home she found a note
written by him which read: "Well, we're gone. Don't try
to find us. My lawyer will contact you in a couple of days."
Upon discovering that the husband had gone and had taken
the child, Audree became upset and hysterical. She was
attended by neighbors. The disappearance of the husband
and child was reported to the police. On June 23, 1954,
Audree consulted the district attorney. He suggested that
she commence a divorce action. Through the Red Cross she
learned that Kenneth had taken the child to the home of his
parents in Whitewater, Wisconsin. On June 27, 1954, she
telephoned to him. Audree testified at the trial that in said
telephone conversation she had asked Kenneth to return to
their home at Bremerton. Kenneth testified that he asked
her to come to Whitewater to live. On July 7, 1954, the
summons and complaint in the divorce action were served
on the defendant in Whitewater. He did not appear in that
action. The wife remained in the Seattle area and worked
there until about the time of the commencement of this action.
The child stayed at the home of the husband's parents. On
March 7, 1955, the court ordered that the child be placed in
the care of Walworth county welfare department pending the
trial. After attending the preliminary hearing of the matter
in the county court of Walworth county at Elkhorn in early
March, 1955, the wife, accompanied by her mother, went
to San Diego, California, where she obtained a position as
an office worker. She set herself up in residence with her
mother in that city. Kenneth matriculated at a university in
Wisconsin in February, 1955. He is engaged in studies
preparatory to teaching. Audree came from San Diego to
Wisconsin with her mother to attend the trial. With permis-

sion of the court she took the child to San Diego when its custody was awarded to her.

In its findings of fact the court determined that Audree had procured a divorce in Washington on November 4, 1954, in an action wherein Kenneth was served personally in Wisconsin and in which action he made no appearance. Amongst other findings particularly pertinent on this appeal are the following:

"That on June 22, 1954, the defendant 'spirited away' the minor child, Keith, from the home in Bremerton, Washington, without the knowledge or consent of the plaintiff and with the purpose of depriving the plaintiff of any privileges of seeing the child and with the intention of keeping his whereabouts and those of the child unknown to the plaintiff, all with the result that the plaintiff suffered an emotional upset.

"That the defendant, after deserting the plaintiff, on June 22, 1954, took the minor child, Keith, to Whitewater, Wisconsin, to the home of his parents and kept the child there entirely separated from the plaintiff until this court intervened . . . ; that this desertion left the plaintiff without financial means to pursue the defendant.

"That the defendant refused to furnish the plaintiff financial assistance to make it possible for her to come to Wisconsin; that instead, he demanded that the plaintiff make no effort to come to Wisconsin to seek the custody of the minor child, Keith.

"That the defendant deserted the plaintiff and forced her separation from her son on June 22, 1954, because of his baseless suspicions and distrust of his wife's loyalty to their marriage.

"That the defendant, at the time that he deserted his wife, was suffering from a physical and mental disease which affected his reasoning.

"That the plaintiff is and was an intelligent, patient, sympathetic, understanding, healthy woman with good morals.

"That the plaintiff was at all times, prior to June 22, 1954, a devoted, capable, and understanding mother who attended to the minor child, Keith, with love and affection.

"That the minor child, Keith, needs the love, care, and affection of his mother, the plaintiff.

"That the defendant has made considerable improvement of his physical condition, but is still physically handicapped and still is possessed with a mental instability which may affect his reasoning and judgment.

"That the plaintiff is able-bodied and self-supporting; that the defendant is a student . . . and presently dependent for his support on a monthly veteran's allotment of $325 which is granted to him by the federal government.

"That the plaintiff now lives with her mother, Mrs. Woods, in California; that both she and her mother are employed.

"That the plaintiff has an equity in a home in Bremerton, Washington, which was set over to her by the Washington divorce decree; that said home originally cost $3,200 and that the unpaid balance of purchase price due on said contract, at the time of the divorce, exclusive of interest, is the sum of $1,600; that since the above-entitled action was commenced, the plaintiff was required to borrow $600 to finance the expenses of her trips to Wisconsin in connection with this litigation and that the home presently bears the additional incumbrance to secure this loan of $600.

"That neither the plaintiff or her mother, Mrs. Woods, have reserve funds of any kind except such as they can draw upon by reason of the equity in the Bremerton property.

"That the plaintiff's mother, Mrs. Woods, desires and stands ready, willing, and able to assist the plaintiff financially and otherwise to maintain and educate the minor child, Keith.

"That the defendant has received a total sum of government allotment payments, between the period from January 7, 1953, to May 31, 1955, in the amount of $9,501.

"That the plaintiff, by reason of the present action, was required to make two trips from Bremerton, Washington, to Elkhorn, Wisconsin, in connection with the trial of the issues

of this action which was financed entirely at her expense.
. . .

"That the wife and mother, Audree Pollock, was required after the husband, Kenneth, became ill, to work in order to supplement their meager income and that such help as they received from the senior Pollocks was nominal only.

"That the condition of the child when it arrived at the Pollock home in Whitewater in June, 1954, indicated that the child had been well cared for by the mother and father at Bremerton; that the child received good care in the home of its paternal grandparents and that the only reason the child was removed therefrom pending the trial was to preserve the *status quo* and insure the child's appearance at the trial."

Appellant especially challenges that finding of the court which declares that he is still possessed of mental instability that may affect his reasoning and judgment. In pressing for a reversal of such finding, appellant points to evidence— medical and lay—introduced on his behalf to the effect that since he came to Wisconsin there has been no episode indicating mental instability on his part. Error is also claimed by him in that the court did not attach due weight and credibility to his denials of the evidence adduced by Audree as to his misconduct, and to the evidence presented on his behalf as to her improper conduct. He maintains that the child will have greater advantages were it placed in his custody, and were it to be reared in his parents' home, than if placed with Audree. He points to the fact that she must work and cannot have the child with her during such hours; that since he is a student, he cannot have the child with him; that he cannot, even though he would, give to Audree financial assistance necessary to enable her to quit work and devote full time to the child's care; that although he is receiving an allotment, the same is contingent in part upon his continued education, and that the child's welfare is being promoted by the continuance of his education, since as a result he will be better able to care for the child in the future.

As a further assignment of error, the appellant also complains with respect to certain remarks of the court during the course of the trial.

The respondent takes exception to the award of the custody of the child to Kenneth commencing in 1960.

It is to be observed that a child's welfare is the controlling consideration of the court in granting or changing custody. The trial court is vested with a large discretion in determining what is for the child's best welfare, and to whom the custody shall be awarded. In reviewing custody cases, this court relies heavily upon the determination by the trial court. Except where there is a clear abuse of discretion, the court's order should prevail. See *State ex rel. Hannon v. Eisler* (1955), 270 Wis. 469, 479, 480, 71 N. W. (2d) 376, and cases there cited.

We have carefully examined the evidence presented at the trial. There is an abundance of competent evidence which the court was entitled to deem credible, that supports the findings. To set forth the evidence relating to the charges that each of the parties alleged against each other, would require many pages of recitals, and we are aware of no particular service that would be rendered thereby. The learned trial court in a comprehensive memorandum decision carefully and conscientiously analyzed the evidence. The court had the benefit of seeing and hearing the parties and their witnesses, and was in a much better position to determine the credibility and weight of the evidence than is this court. While it is true that a reputable doctor testified at the trial that in his opinion Kenneth was not suffering from any impairment of mind, and while other witnesses, principally relatives, testified that Kenneth's mental condition was excellent since he had come to Wisconsin, nevertheless, the court had opportunity of observing Kenneth and (as appears from the memorandum decision) considered his behavior as found to exist before he came to Wisconsin, and also his

attitude toward Audree after he came to this state. The court was entitled to weigh these items, as well as to consider the emotional reactions exhibited by Kenneth at the trial, when it was formulating its determination as to whether Kenneth was still possessed of mental instability. We cannot hold that this finding is against the great weight and clear preponderance of the evidence.

Appellant contends that it would be of greater advantage for the child to live in the home of Kenneth's parents than with Audree and her mother. This item, too, is one that was peculiary for the court to determine. Apparently both the home of the boy's mother and that of his paternal grandparents are good homes. On the one hand, the court was confronted with the question: Shall the boy who is of tender age be deprived of the care of his mother who (as found by the court) is an intelligent, patient, sympathetic, understanding, healthy woman with good morals, who has been a devoted, capable, and understanding mother to him, and who had attended him with love and affection? It is not seriously disputed that the child had been well provided for by the mother while the parents lived together,—even while the mother was off to work, and while the father was attending the university, and when the child was left with sitters. Under the arrangement offered in court by the mother, it appears that either she or her own mother would be in attendance upon the boy at all times. On the other hand, Kenneth's parents are excellent citizens who themselves have reared six children. Under the plan offered by the father, the boy would be cared for by the grandparents. Kenneth, of course, is away at school, and his direct contact with the child would be but occasional. In the light of this situation, it cannot reasonably be declared that it would be less beneficial for the welfare of the boy to be placed in the custody of his mother instead of that of his father. As was said in

*Dodge v. Dodge* (1955), 268 Wis. 441, 444, 67 N. W. (2d) 878:

"*In custody cases it is impossible to fix rules which are inflexible. Each case must be considered in the light of all of the facts and circumstances that appear in the record.* One rule is that the welfare of the child is the paramount and controlling consideration in determining the question of custody of a minor child. Another rule often quoted by the courts is that in legal contests for the custody of minor children the law favors the mother unless she is found to be an unfit person to exercise such custody. *The trial court in these cases is in a favorable position to exercise discretion and sound judgment. . . .*

"In reviewing custody cases this court relies heavily upon the determination by the trial court. *Except in the very few cases where there is a clear abuse of discretion, the court's order should prevail.*" (Emphasis supplied.)

In *Hellermann v. Hellermann* (1946), 249 Wis. 190, 23 N. W. (2d) 408, this court pointed out that with regard to children of tender age, preference will ordinarily be given to the mother, other things being equal and she not being unfit.

Two clergymen and a police officer who testified as experts at the trial on behalf of the appellant, gave opinions to the effect that a father's influence is an important factor in the life of a child. One of these witnesses declared that a father presents a more important factor in the life of a child than does a mother. Another of the witnesses asserted that if a child is raised without a father, the child carries the mark. Counsel for appellant directed the trial court's attention to the consideration given by this court in *Cudahy v. Cudahy* (1935), 217 Wis. 355, 258 N. W. 168, with reference to the testimony of experts to the effect that a boy of eight years of age had more need of his father than of his mother under the circumstances of that case. Pointed out also to the trial court

by appellant's counsel was the view of some experts referred to in *Adoption of Tschudy* (1954), 267 Wis. 272, 65 N. W. (2d) 17, that in adoption situations it is well for the child to have two adoptive parents. By certain remarks of record, the trial court indicated that its own views did not fully coincide in all particulars with those of the experts.

Expert testimony is proper and competent concerning matters involving special knowledge or skill or experience upon subjects that are not within the realm of the ordinary experience of mankind, and which require special learning, study, and experience. However, it is to be borne in mind, that while such opinions are allowed in judicial proceedings, nevertheless, it is within the province of the fact finder or fact finders to say what weight shall be given to those opinions. The court, in a situation as here, was not bound by the opinions given by the experts. We find no prejudicial error in the remarks of the court.

We are constrained to hold that the trial court did not abuse its discretion in awarding the custody of the child to the respondent.

There is no challenge by the respondent in regard to the trial court's determination that the Washington court had not acquired jurisdiction in the divorce action with respect to the custody of the child. Strenuous objection, however, is raised by the respondent against the trial court's order in directing that the custody of the child is to be transferred to the appellant in 1960. While it is within the power of a court to change the custody of a child, nevertheless, a decree fixing custody is final on the condition existing when the decree is rendered, and should not be changed afterward unless an altered condition arises subsequent to the decree. 17 Am. Jur., Divorce and Separation, p. 519, sec. 684. See also Anno. 16 A. L. R. (2d) 664. In *Hill v. Hill* (1950), 257 Wis. 388, 391, 43 N. W. (2d) 455, it was said:

"It has been repeatedly held by this court that a judgment in a divorce suit does not prevent the court from *afterward* modifying a judgment under sec. 247.24, Stats., if the circumstances of the parties have so changed as to render such modification just and equitable. In matters relating to custody, however, this court has held that in the absence of a substantial change in the premises on which the original determination was made, a modification or revision is an abuse of discretion. *Smith v. Smith* (1932), 209 Wis. 605, 609, 610, 245 N. W. 644; *Application of Rattel* (1943), 244 Wis. 261, 265, 266, 12 N. W. (2d) 135; *Romanowski v. Romanowski* (1944), 245 Wis. 199, 203, 204, 14 N. W. (2d) 23." (Emphasis supplied.)

For the reason that the husband took the child from the matrimonial domicile of the parties in Washington, the wife was prevented from having the matter of the custody of the child validly determined in the divorce action there. Under modern decisions it is quite generally held that a divorce action is divisible, and that while a court of one state may dissolve the marriage, items such as custody and alimony may be determined by a court in another state which acquires jurisdiction with respect to such matters. This court approved of such view in *Ische v. Ische* (1948), 252 Wis. 250, 31 N. W. (2d) 607, 32 N. W. (2d) 70. Under provision of sec. 247.24, Stats., and the construction given thereto in *Hill v. Hill, supra,* the court may modify a custody order when there has been a substantial change in the premises on which the original determination was made. A court, however, is not empowered when fixing custody to anticipate such substantial change merely on the basis of the passage of time. It is recognized that before adjudicating a custody application, the court is empowered to direct temporary placement, and in this state such is frequently referred to as temporary custody. In the instant case the court's order cannot be construed as relating only to temporary place-

ment. Should the circumstances affecting the interested parties or the welfare of the child be materially changed in the future—be it five years after judgment, or prior or subsequent to such time—the court will, of course, be empowered upon proper application by the appellant to determine whether change is to be directed. The burden of establishing that conditions subsequent to the judgment have been so materially changed as to require modification, will be upon the appellant. As said at 27 C. J. S., Divorce, p. 1195, sec. 317 (5) :

"The presumption favors the reasonableness of the original decree, and the party seeking modification has the burden of proof to show facts warranting modification and that the change is for the child's best interests."

Since the trial court when awarding custody of the child to the respondent was not in a position to anticipate the changes which may occur in the condition of the parents, or in their habits, character, and fitness to have the custody and care of the child in the future, and was not in a position to foretell the situation of the child in the future, that portion of the judgment awarding custody to appellant commencing August 31, 1960, is invalid and of no force and effect.

Having awarded custody of the child to respondent, it was proper that the court direct that the appellant make contribution to the respondent for the child's support.

Alimony was not provided in the divorce judgment. A decree awarding alimony is in the nature of a judgment *in personam*. Since service of the summons and complaint in the divorce action was not made upon Kenneth Pollock in Washington, the court of that state did not acquire jurisdiction over his person. Had the court made an award of alimony, its order in such regard would not have been valid.

The courts are divided as to whether a valid *ex parte* divorce decree obtained by a wife in a jurisdiction in which

her husband does not reside, precludes her from thereafter obtaining alimony, as an incident of the marriage relationship, from him in a jurisdiction in which he resides,—some courts permitting, and others refusing to permit the wife to maintain a suit for alimony. See Anno. 28 A. L. R. (2d) 1414. Some of the courts which bar alimony under such circumstances, predicate their position upon the basis that by voluntarily choosing the forum of the divorce action, the wife deprives herself of the opportunity to have her claim for alimony adjudicated elsewhere. In the case at bar such view was expressed by the trial court in its memorandum decision with reference to its conclusion that it was without jurisdiction to award alimony. The court relied upon the rule as enunciated in *McCoy v. McCoy* (1921), 191 Iowa, 973, 183 N. W. 377, and in other cases referred to in 28 A. L. R. (2d) 1414.

We think, however, that the better rule is laid down in *Stephenson v. Stephenson* (1936), 54 Ohio App. 239, 6 N. E. (2d) 1005, where it was held that when a wife, in an action for divorce, obtains personal service upon her husband, the question of alimony must be litigated therein, and the decree rendered is *res adjudicata* on all questions existing between the parties arising out of their marital relationship, including alimony; however, when a wife, in an action for divorce brought in the jurisdiction wherein she is domiciled, obtains only constructive service upon the husband, the right to alimony continues until it is adjudicated, and the decree of divorce in such proceeding is not a bar to a subsequent action for alimony. There is no distinction as to the effect of the decree rendered in a foreign forum from that rendered in a domestic forum. Other cases sustaining like rule are cited and annotated at 28 A. L. R. (2d) 1415. There has heretofore been expression in this state that a wife's right to alimony, as an incident of the marriage relationship, survives a valid *ex parte* divorce decree by the husband

against a nonresident wife in another jurisdiction. See *Cook v. Cook* (1882), 56 Wis. 195, 14 N. W. 33, 14 N. W. 443; *Price v. Ruggles* (1943), 244 Wis. 187, 11 N. W. (2d) 513; and *Ische v. Ische, supra.*

In *Cook v. Cook, supra,* it was held that a divorce judgment obtained by a husband in Michigan upon service by publication was not a bar to a subsequent action by the wife in Wisconsin for divorce and alimony. However, in the concurring opinion, Mr. Justice TAYLOR expressed the view that while the Michigan decree of divorce may have terminated the marriage, a court of equity in Wisconsin could, upon the ground of the foreign divorce, entertain an action for alimony. Justice TAYLOR in his opinion specifically declared (p. 220):

"It would seem to be no great stretch of authority to entertain a proceeding to award alimony to a wife out of the husband's property in this state, upon the foot of a divorce granted to the husband in another state, of which she had no notice until after judgment, and by the terms of which she was not awarded a reasonable compensation by way of alimony, or even when no alimony was awarded."

In *Price v. Ruggles, supra,* the court noted that the nonrecognition of a foreign decree of divorce as attempted in *Cook v. Cook, supra,* had been expressly overruled by the decision in *Williams v. North Carolina* (1942), 317 U. S. 287, 63 Sup. Ct. 207, 87 L. Ed. 279, 143 A. L. R. 1273. However, in *Price v. Ruggles,* while leaving the question for future decision, this court nevertheless indicated that notwithstanding that a foreign decree of divorce had the effect of destroying the marriage, a wife, to whom no alimony had been granted under the divorce judgment, could, it would seem, when obtaining service upon the former husband, prosecute a suit in equity for alimony in this state.

In *Ische v. Ische, supra,* the husband had obtained a decree of divorce in Nevada. Subsequently, the wife commenced an action for divorce from bed and board and for alimony, division of estate, custody of the child, and support money, in Wisconsin. The trial court determined that the Nevada divorce decree was valid and was entitled to the protection of the full-faith-and-credit clause of the United States constitution, sec. 1, art. IV. The trial court sustained the husband's plea in abatement in so far as it set up the Nevada judgment as a bar to the application for a bed-and-board-divorce decree in Wisconsin. A divorce decree as prayed for was not granted. However, the trial court concluded that it possessed jurisdiction to adjudicate matters of alimony, support money, division of estate, and custody of the child, inasmuch as such were not determined or determinable in the divorce action in Nevada. This court upon authority particularly of sec. 247.28, Stats., *Setzer v. Setzer* (1947), 251 Wis. 234, 29 N. W. (2d) 62, and *Dovi v. Dovi* (1944), 245 Wis. 50, 13 N. W. (2d) 585, sustained the judgment of the trial court with respect to the adjudication of alimony.

In *Thurston v. Thurston* (1894), 58 Minn. 279, 59 N. W. 1017, it appears (from facts recited in the opinion) that the husband who had been domiciled with his wife in Minnesota, deserted her, and procured a judgment of divorce in Washington. Subsequently the wife sued for alimony in Minnesota. The court held that the action for divorce was a proceeding *in rem* which seized the marriage status (the res), and condemned and destroyed it. Specifically the court said (p. 286):

"The question of alimony is not *res judicata* by reason of the judgment of divorce in the proceeding *in rem.* Neither does that judgment estop this plaintiff from showing that Thurston had committed acts which entitled her to a divorce and to alimony, and that she had committed no acts which forfeited her right to alimony, or which entitled him to a

divorce, if that is material. That judgment establishes nothing except that the marriage relation has been condemned and destroyed by a judgment of divorce; all other questions are *res nova*.

"There are cases, such as *Cook v. Cook,* 56 Wis. 195, 14 N. W. 33, 443, and *Wright v. Wright,* 24 Mich. 180, where it is held that in such a case as this a second divorce should be granted in the state of the wife's domicile, for the purpose of decreeing her, as incidental thereto, alimony and a share of the property. But it seems to us to be illogical to assume jurisdiction for the purpose of killing something which is admitted to be already dead. It seems to us more in accord with sound principles in such a case to allow the plaintiff to proceed for alimony alone, without the useless formula of a second divorce, and such is the doctrine of the cases of *Cox v. Cox,* 19 Ohio St. 502, and *Turner v. Turner,* 44 Ala. 450. We are of the opinion that the action can be maintained by the wife for the recovery of alimony, though the parties are already thus divorced, at least when there is such an obstacle to her obtaining alimony in the original proceeding as existed in this case."

See also *Searles v. Searles* (1918), 140 Minn. 385, 168 N. W. 133, and *Nelson v. Nelson* (1946), 71 S. D. 342, 24 N. W. (2d) 327.

In *Armstrong v. Armstrong* decided by the United States supreme court on April 9, 1956, 350 U. S. 568, 76 Sup. Ct. 629, 100 L. Ed. 705, it appears that the husband filed a suit for divorce from his wife in Florida. The parties had been separated and the wife had gone to Ohio where constructive service was had upon her. Later she commenced a suit in Ohio for divorce and alimony. The Ohio trial court found that the wife had established grounds for divorce in Ohio, but denied the divorce because Florida had already decreed a divorce to the husband. The trial court, however, made an award of alimony. The Ohio supreme court upheld the trial court's judgment. In affirming the Ohio supreme court, the United States supreme court said (350 U. S. 571):

"There was a valid decree in Florida dissolving the bonds of matrimony. There was no decree as to alimony. Ohio had personal service on both parties in a suit for divorce and alimony brought there by Mrs. Armstrong. The court denied her a decree of divorce because Florida had already dissolved the bonds of matrimony. The Ohio court found that, but for the decree in Florida, Mrs. Armstrong had established grounds for divorce in the Ohio suit. It considered that the matter before it was not a division of property, but an application for alimony, and it proceeded to hear evidence on that basis and finally entered a personal judgment against the defendant husband for alimony. The Ohio court, which had complete jurisdiction of both parties and the cause of action, entered a decree as to alimony only, which decree seems clearly authorized by the Ohio cases. *Slapp v. Slapp,* 143 Ohio St. 105, 54 N. E. (2d) 153; *Cox v. Cox,* 19 Ohio St. 502. The Florida judgment was given full faith and credit by Ohio as far as the judgment in Florida went, and no other questions are presented here."

We are of the opinion that in the case at bar, since the Washington decree of divorce was valid, and since the marriage status or relationship had been destroyed, it would have been useless procedure for respondent to again institute a divorce action in Wisconsin in order to enable her to obtain alimony and the other considerations which she sought, and which the Washington court was without jurisdiction to have extended to her.

A consideration of the authorities above referred to leads us to the conclusion that in circumstances as here, a court of this state possesses jurisdiction in an equity action to determine items of alimony, support money, and custody upon the ground of a divorce judgment rendered in another state. The provisions of ch. 247, Stats., relating to divorce, are applicable to such considerations by the court. The trial court in the case at bar was not without jurisdiction to grant alimony. Since the Washington court lacked jurisdiction in the divorce action to adjudicate the item of alimony, the

respondent is entitled to a determination of her application for alimony in the trial court here. The cause is to be remanded for such consideration.

In its judgment the trial court directed payment of respondent's expenses, particularly for travel in attending the trial and for attorney fees. Such item had been demanded in the complaint. The court based its judgment in this respect upon its inherent power to allow the same. We conclude that the court possessed such power. We are also of the opinion that the allowance of such expense was authorized by ch. 247, Stats.

The court also directed a contribution by the appellant toward the respondent's costs and fees on appeal. Appellant challenges the jurisdiction of the court with reference to its allowance of such item. Since, as ruled here, matters of custody and allowance supplementary to a foreign divorce decree are to be governed by ch. 247, Stats., we conclude that the allowance of counsel fees and disbursements on appeal in a matter of this kind is to be controlled by provision of Supreme Court Rule 43a, sec. 251.431, Stats.

*By the Court.*—The judgment is modified to the extent that there be deleted therefrom the provision adjudicating that on August 31, 1960, and thereafter, the custody of the child of the parties be granted to the defendant. The cause is remanded for determination as to the amount of alimony, if any, that shall be allowed to the plaintiff. In all other respects the judgment is affirmed. The order directing payment by the defendant of plaintiff's expense in connection with this appeal, is affirmed. Costs to respondent.