STATE, Respondent, v. JOHNSON, Appellant.

*No. State 102. Argued March 29, 1972.—Decided May 2, 1972.*
(Also reported in 196 N. W. 2d 717.)

562

For the appellant there was a brief and oral argument by *Robert D. Junig* of Beloit.

For the respondent the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HALLOWS, C. J.  Johnson claims the trial court erred in permitting a lay person to identify the drug as lysergic acid diethylamide (LSD) and absent such identification the evidence was insufficient to support the jury verdict. He also claims there was no credible evidence he was a supplier within the meaning of sec. 151.07 (12) (b), Stats. 1967 [2] as that term is defined in sec. 151.07 (1) (k), Stats. 1967.

The evidence shows that on the evening of February 5, 1970, Johnson in the company of Thomas Bernstein aged nineteen and Michael Cook went to 1015 Chapin Street in the city of Beloit and there traded a quantity of marijuana for three aspirin-sized tablets purported to contain LSD. Johnson and Cook orally consumed the tablets immediately but Bernstein waited a while before taking the tablet that Johnson gave him.

When Bernstein related these events at the trial as a state witness, the defense objected on the ground Bernstein was incompetent to give an opinion that the tablets were LSD. In an attempt to qualify Bernstein outside of the presence of the jury, he gave his opinion of the drug as being LSD. He testified he had taken about 130 trips on LSD and had seen Cook under the influence of the drug several times. The tablets consumed were aspirin-size with a purple spot on one side. Bernstein testified he had taken such tablets several times before and recognized them as LSD. He described the reactions he had to the pill he took on February 5th and the reactions Cook and Johnson said they were having, such

---

[2] Sec. 151.07 (1) (a) 3 defines lysergic acid diethylamide as a dangerous drug. The crime was alleged to have occurred on February 5, 1970. Effective February 20, 1970, sec. 151.07 (12) (b), Stats. 1967, became, in amended form, sec. 161.30 (12) (d), Stats. 1969 (the history of clerical errors in the renumbering of sec. 151.07 (12) (b), Stats. 1967, and the transition to sec. 161.30 (12), Stats. 1969, is recounted in *State ex rel. Gutbrod v. Wolke* (1971), 49 Wis. 2d 736, 183 N. W. 2d 161).

as dilation of the pupils, the appearance of objects as "crystal clear," and an emotional state. Bernstein testified that his reaction to the pill he took on February 5th was similar to the reactions he had by taking LSD. On cross-examination he stated LSD was tasteless, colorless, and odorless, and one's knowledge of whether he actually received LSD in a purchase was based largely upon the representations of the seller. Bernstein admitted he had not taken chemistry in school; he had only gone to college a few months and had read only one book on drugs. His opinion, however, was based on the appearance of the pill he received, the veracity of the seller, his reactions and those of Cook and Johnson after ingesting the pill, and his past experience with the drug. The defense offered to prove by an expert witness Dr. Melvin Weinswig, who held a Ph.D. in medicinal chemistry, that a person could not identify LSD by the effects the substance had on a user. The trial court held Bernstein was competent to give his opinion at the trial and Dr. Weinswig's testimony would be received at trial and would go to the weight of Bernstein's testimony, not to its admissibility.

The issue is not whether expert testimony or opinion is necessary to prove the identity of a dangerous drug, but whether Bernstein can qualify to give an opinion that the tablet given him contained LSD. This court has long held that expert testimony should be adduced concerning matters involving special knowledge or skill or experience on subjects not within the realm of ordinary experience or knowledge of mankind. *Pollock v. Pollock* (1956), 273 Wis. 233, 77 N. W. 2d 485; *Cramer v. Theda Clark Memorial Hospital* (1969), 45 Wis. 2d 147, 172 N. W. 2d 427. The test or principal rule of admissibility of expert testimony is "whether the members of the jury having that knowledge and general experience common to every member of the community would be aided in a

consideration of the issues by the testimony offered and received." *Anderson v. Eggert* (1940), 234 Wis. 348, 361, 291 N. W. 365; *see also: Kreyer v. Farmers' Cooperative Lumber Co.* (1962), 18 Wis. 2d 67, 75, 117 N. W. 2d 646; and *Schmidt v. Chapman* (1964), 26 Wis. 2d 11, 25, 131 N. W. 2d 689. The lack of expert testimony in cases where it is necessary constitutes an insufficiency of proof. *Cramer v. Theda Clark Memorial Hospital, supra,* at 152; *see also: Cedarburg Light & Water Comm. v. Allis-Chalmers* (1967), 33 Wis. 2d 560, 148 N. W. 2d 13; 149 N. W. 2d 661. It must be conceded the jury in this case needed expert testimony in order to determine whether the tablet Johnson gave Bernstein and Cook was the dangerous drug LSD. Whether a given substance is in fact LSD is beyond the ken of laymen of ordinary experience. *See People v. Williams* (1962), 25 Ill. 2d 562, 185 N. E. 2d 686.

Expertise in the field of dangerous drugs is not necessarily restricted to medical doctors and pharmacists. Experience is a proper basis for giving an expert opinion as well as technical and academic training. *Luke v. Northwestern National Casualty Co.* (1966), 31 Wis. 2d 530, 143 N. W. 2d 482; *Netzel v. State Sand & Gravel Co.* (1971), 51 Wis. 2d 1, 186 N. W. 2d 258. Indeed, experience in some cases may be the more important element of expertise. Whether an opinion of a witness may be given depends upon his superior knowledge in the area in which the precise question lies. It might well be that a person is an expert in relation to some drugs and not of other drugs. We have no previous case in this state determining whether a drug user from his personal experience in using a drug and observing other drug users and from his conversation with them may qualify as an expert entitled to identify a substance from its appearance and its effect on him and his companions who have ingested the substance.

Here, Bernstein was familiar with LSD and its effect upon a person, including himself. Although Dr. Weinswig testified no lay person could identify LSD by appearance and its effect, such testimony goes to the weight of Bernstein's testimony and not to his qualifications for forming an opinion. In making this statement that appearance and effects were not the test to determine LSD, Dr. Weinswig did state the symptoms and effects related by Bernstein from ingesting the drug were consistent with the ingestion of LSD. This testimony distinguishes the facts of this case from *Lubner v. Peerless Ins. Co.* (1963), 19 Wis. 2d 364, 120 N. W. 2d 54, where an undertaker stated upon inserting a drain tube in the deceased's lung he drew out about a glassful of water and thereupon concluded death was the result of drowning. A physician testified such procedure was worthless to determine the cause of death because water in the lungs was not necessarily an indication of drowning, and the layman therefore was held incompetent to give an opinion as to the cause of death. Following this case, this court held in *Novakofski v. State Farm Mut. Automobile Ins. Co.* (1967), 34 Wis. 2d 154, 148 N. W. 2d 714, that when a physician states a layman cannot diagnose coronary thrombosis, such testimony would destroy the competency of a lay coroner from concluding the coronary thrombosis was the cause of death. The situation here is quite different; we are not prepared to say that the study of the effect of hallucinogens has become such an exact science that a conclusion by a pharmacological chemist completely destroys all evidentiary value of the opinion of a longtime drug user. As an extensive user of a dangerous drug who experienced its effects over 100 times and who has seen its effect on other people, Bernstein had special knowledge of the drug and we think he would qualify to give his opinion. We have long held a lay person is qualified from experience to give an opin-

ion as to the time of death. *Casimere v. Herman* (1965), 28 Wis. 2d 437, 442, 137 N. W. 2d 73, citing *Palmer v. Schultz* (1909), 138 Wis. 455, 120 N. W. 348.

While a chemical analysis may be a more scientific test to determine the nature of a drug, nevertheless as a practical matter in this type of case where the substance has been ingested, no such test is available. Without the use of satisfactory circumstantial evidence, there could be no convictions in this type of case. When a chemical analysis is impossible, it need not be shown and if the circumstantial evidence is sufficiently strong, it may support a verdict as to the nature of the drug without the aid of medical testimony. Bernstein's testimony was of such quality and quantity as to be sufficient to sustain the verdict if the jury wanted to accept it. It was for the jury to weigh the evidentiary value of Bernstein's conclusion that the substance was LSD against the conclusion of Dr. Weinswig that a lay person could not identify LSD the way Bernstein did. The jury has the power and the duty to determine the credibility of expert witnesses and the probative value of their testimony. *Pollock v. Pollock, supra; Fehrman v. Smirl* (1963), 20 Wis. 2d 1, 121 N. W. 2d 255, 122 N. W. 2d 439; *Schwalbach v. Antigo Electric & Gas, Inc.* (1965), 27 Wis. 2d 651, 135 N. W. 2d 263; *Mancheski v. State* (1970), 49 Wis. 2d 46, 181 N. W. 2d 420.

Johnson claims he was not a supplier of the drug. The evidence shows that while Johnson, Bernstein, and Cook were at the Chapin street address in the city of Beloit, Johnson traded some marijuana for three tablets impregnated with LSD. While it is possible Cook and Bernstein took part in "negotiating" the trade at least to the point of suggesting to Johnson he should get some LSD, nevertheless, it was Johnson who controlled the deal with his marijuana and was able to obtain the LSD to furnish it to Cook and Bernstein. There is ample testimony that

Johnson was the active person in making the trade and receiving the LSD. On other occasions Johnson had obtained "acid" at that address and given it to Bernstein. This was not a joint adventure with Johnson acting in the role of an agent. The claim is not that Johnson did not give the LSD tablets to Cook and Bernstein, but he furnished the LSD as a friend and for free and therefore he is not a supplier.

A "supplier" is defined in broad terms in sec. 151.07 (1) (k), Stats. 1967.[3] The language is certainly broad enough to cover a commercial supplier but there is no indication in the language used that the concept of a supplier should stop there. The language includes in its ambit noncommercial suppliers or anyone who "gives any dangerous drug." Giving is tantamount to "furnishing" in sec. 151.07 (12) (b), Stats. 1967. The statute is not so much concerned with the method of transmission as it is with the fact that drugs were made available to a user. This section is designed to suppress the use as well as the traffic of drugs and to reach this object effectively, and the definition of supplier includes the giving as well as manufacturing and selling. The degree of culpability between giving for free and selling for profit can be recognized by the trial court in sentencing on particular facts. We think that was done here, because the maximum penalty under this section is five years and Johnson received only three years.

*By the Court.*—Judgment affirmed.

---

[3] " 'Supplier' means any unauthorized person who manufactures, sells or gives any dangerous drug defined under this section for the use of any person for whom such drug has not been prescribed by a practitioner or who in any way delivers such contraband material to anyone he intends to induce to become a user."