COURT OF APPEALS
DECISION
DATED AND FILED

August 21, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP491-CR**

Cir. Ct. No.  **2021CF1556**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

AMANDA K. LENTI,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: NICHOLAS J. McNAMARA, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Amanda Lenti appeals her convictions for possession with intent to deliver tetrahydrocannabinol (THC) and second-degree

reckless injury while using a dangerous weapon, arguing that the evidence was insufficient to support the jury's guilty verdicts. Specifically, as to the possession with intent count, Lenti argues that, in the absence of chemical testing of the subject marijuana, the evidence was insufficient to sustain the conviction. As to the reckless injury count, Lenti argues that the evidence was insufficient because the evidence established that she acted in self-defense. We reject Lenti's arguments and affirm the convictions.

## BACKGROUND

¶2 As stated, a jury convicted Lenti of possession with intent to deliver THC and second-degree reckless injury while using a dangerous weapon. The evidence at trial included the following.

¶3 On July 7, 2021, at approximately 11:00 a.m., police were dispatched to the area of James Madison Park in Madison, based on a report of a shooting. Police encountered A.B., who had a bloody arm.[1] A.B. told police that he had been in an argument with another man and that the man shot him. While speaking with A.B., the officer noticed that A.B. smelled of marijuana.

¶4 A.B. was taken to the hospital, where a doctor removed a bullet or bullet fragment from A.B.'s right arm. Police searched A.B.'s clothing, which was provided by hospital personnel, and found 13.5 grams of marijuana in a plastic bag in one of A.B.'s pockets.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2023-24), we refer to A.B. using initials that do not conform to his actual name. All references to the Wisconsin Statutes are to the 2023-24 version.

¶5     Police searched the vehicle A.B. had been driving and observed blood on the right side of the driver's seat.  Police also found a small amount of marijuana; a stolen handgun under the driver's seat; several bundles of cash, including one in the amount of approximately $1,500; a photo identification card for A.B.; and a cell phone.

¶6     When police seized A.B.'s cell phone, it rang and police saw a message on the lock screen from a person identified as Fo Nem.  A search of A.B.'s phone revealed text messages between A.B. and Lenti leading up to the time of the shooting.  The messages showed the two arranging to meet at an apartment building on Fordem Avenue in Madison.  Lenti's phone accessed cell towers near the Fordem Avenue address just before and during the time of the shooting.  Traffic cameras also identified A.B.'s vehicle driving from Fordem Avenue and turning onto Johnson Street toward James Madison Park immediately after the shooting.

¶7     A day after the July 7 shooting, Lenti's friend Melissa Eisner contacted police, and informed them that a friend of hers had been involved in a shooting in Madison on July 7 at around 11:00 a.m.  An officer interviewed Eisner and testified to the following regarding Eisner's statements.[2]  At about 11:30 a.m. on the day of the shooting, Lenti left a "frantic" phone message with Eisner indicating "that it was like a matter of life and death."  Lenti told Eisner to download the mobile phone application Signal, which the officer knew to be an

---

[2] The prosecution at trial introduced the substance of Eisner's statements to police through an officer's testimony after Eisner, while testifying, generally denied remembering anything about what Lenti had told her or what she had told police.

encrypted communication application that people use to communicate "when they don't want anyone finding the communications."

¶8    Lenti told Eisner that she was "involved in a shooting in self-defense" in the entryway of an apartment building on Fordem Avenue on July 7. Lenti had been trying to deliver five pounds of marijuana in three packages for a dealer, "Fo." The man who was supposed to purchase the marijuana pulled a gun and threatened to kill Lenti, telling Lenti that he was "wanted in three states," which caused Lenti to give him the drugs. The man then turned around and began walking away from Lenti. Once there was some separation between Lenti and the man, Lenti drew her weapon and fired at him, shooting him in the arm.

¶9    Lenti further told Eisner that Lenti thought, "I'm fucked," when she gave the man the marijuana. Eisner understood Lenti to mean that Fo had fronted her the drugs—*i.e.*, gave her the drugs "on credit" with the expectation that she would give Fo the proceeds following the sale—and that if Lenti lost the drugs and did not have the money for them, she "would be in very deep trouble."

¶10    The officer testified that, based on his training and experience, a higher-level dealer will sometimes "front" drugs to someone they know and may have had "other dealings with in the past" for that person to sell or deliver the drugs to others on credit. The officer also testified that a person in Lenti's position who is robbed of fronted drugs may as a consequence suffer violence at the hands of the dealer.

¶11    Lenti told Eisner that, after she shot the man, he fell, dropped the packages of marijuana, and then ran away. Lenti initially also ran, but after she saw the man running away, she circled back and retrieved the marijuana. Lenti told Eisner that she was trying to get in touch with Fo to return the marijuana and

that she had buried the gun. Eisner showed the officer a photo on her phone of a .380 caliber handgun that Lenti had purchased when Lenti and Eisner lived together.

¶12 The day after the shooting, police searched Lenti's home in Jefferson County. The officer heard Lenti tell her aunt, who was present at Lenti's house, "I gave him my address. He was going to come here to pick it up. He knows where I live." The officer thought that Lenti was referring to A.B., and her tone of voice suggested concern "about retaliation for her shooting" him.

¶13 While searching Lenti's house, police found a box of ammunition for a .380 caliber handgun. They also found: a "grow chamber" and a notebook logging attempts to grow various strains of marijuana; glass jars with various strains of marijuana written on the lids; and, in various locations throughout the residence, marijuana seeds. Police took Lenti into custody, during which time she began yelling, "I was there," and that she had been trying to sell a pair of Nike shoes and had run away when someone put a gun to her head.

¶14 The jury also heard two recorded phone calls made by Lenti to a friend while Lenti was in jail. During one of the calls, Lenti said that police did not find "the thing they built" and asked the friend to go to her house and to "get the bad shit out." When the friend asked if it was "anything worth saving ... at this point," Lenti said that it was likely "all dead" and a fire hazard. During the other call to the same friend, Lenti said that A.B. had told police that "some big black guy" had shot him. Lenti also told the friend that Lenti had gone "to sell some shoes to a ... different guy" than A.B. Lenti said the "different guy" hit her with a gun and "tried to rob [Lenti] and rape [her] and [that Lenti] left." She said that perhaps "the guy that robbed me" was the person who shot A.B.

¶15    By the time of trial, police had not recovered Lenti's handgun or the marijuana, and neither A.B. nor Lenti testified at trial.

¶16    The jury found Lenti guilty of possession with intent to deliver THC and reckless injury while using a dangerous weapon.  After the verdicts and before sentencing, Lenti moved for judgment notwithstanding the verdict on the conviction for possession with intent to deliver, arguing that because the State never recovered—and therefore never tested—the alleged substance that Lenti tried to sell to A.B., the evidence at trial was insufficient to prove beyond a reasonable doubt that the substance was THC as opposed to a legal derivative of a marijuana plant, such as cannabidiol (CBD) oil.  Following briefing, the circuit court denied the motion.  Relying primarily on *State v. Anderson*, 176 Wis. 2d 196, 200, 500 N.W.2d 328 (Ct. App. 1993), the court concluded that the State could prove the identity of an illegal controlled substance with evidence other than a laboratory report, and that in this case, there was sufficient "circumstantial" evidence to support the jury's verdict.  Lenti appeals.

## DISCUSSION

¶17    On appeal, Lenti renews her argument that there was insufficient evidence to support the conviction for possession with intent to deliver THC (sometimes referred to in this opinion as marijuana).  She also challenges the sufficiency of the evidence as to the reckless injury conviction.  For the reasons explained below, we reject Lenti's arguments.

*I. Standards Governing Review of a Jury's Guilty Verdict.*

¶18    We accord great deference to the factfinder when reviewing a challenge to the sufficiency of the evidence.  *State v. Poellinger*, 153 Wis. 2d 493,

507, 451 N.W.2d 752 (1990). When reviewing a jury's guilty verdict, we "may not substitute [our] judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.* "If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it." *Id.* We "will only substitute [our] judgment for that of the trier of fact when the fact finder relied upon evidence that was inherently or patently incredible—that kind of evidence [that] conflicts with the laws of nature or with fully-established or conceded facts." *State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990); *see also State v. Watkins*, 2002 WI 101, ¶77, 255 Wis. 2d 265, 647 N.W.2d 244 ("It is vitally important to maintain this standard of review. An appellate court should not sit as a jury making findings of fact and applying the hypothesis of innocence rule de novo to the evidence presented at trial.").

## II. The evidence was sufficient to support Lenti's conviction for possession with intent to deliver THC.

¶19 To convict Lenti of possession with intent to deliver THC in violation of WIS. STAT. § 961.41(1m)(h)1., the jury was required to find the following four elements: (1) Lenti possessed a substance; (2) that substance was THC; (3) Lenti knew or believed that the substance was THC; and (4) Lenti intended to deliver the THC. WIS. JI–CRIMINAL 6035 (2024). Lenti's challenge focuses on the second element. She renews her argument that, because the State never tested the substance that she possessed, the evidence was insufficient to

support the jury's finding that the substance was THC, as opposed to a legal derivative of the marijuana plant.

¶20 Expert testimony and testing are not always necessary to identify a controlled substance for purposes of the possession statutes. *See Anderson*, 176 Wis. 2d at 200. "Identification of a controlled substance can be established by such circumstantial evidence as lay experience based on familiarity through prior use, trading, or law enforcement; a high sales price; on-the-scene remarks by a conspirator identifying the substance as a drug; and behavior characteristic of sales and use." *Id.* at 202-03 (internal quotation marks and quoted sources omitted).

¶21 Here, considered in the light most favorable to the State and the verdict, there was sufficient evidence to support the jury's finding that the substance that Lenti possessed was THC, even in the absence of a laboratory report. This evidence included the following. There was the testimony that Lenti told Eisner that the substance was marijuana, strongly supporting a finding that Lenti herself believed it was marijuana. There was also evidence that Lenti was highly familiar with marijuana and was not new to drug sales and manufacturing. Beyond this was the evidence that Lenti was growing marijuana on her property and had enough prior dealings with Fo that he would front her a significant quantity of marijuana. As the circuit court noted when denying Lenti's motion for judgment notwithstanding the verdict, the jury could reasonably find that Lenti was not "a random person who[,] for the first time[,] completely disconnected from any sort of drug business[,] all of a sudden is involved in this delivery."

¶22 There was also evidence that, when Lenti attempted to sell what she believed to be marijuana to A.B., A.B. robbed her at gunpoint, threatening to kill Lenti unless she gave him the marijuana. This evidence included testimony,

8

which the jury could have credited, that Lenti told Eisner that Lenti and A.B. arranged for a sale of five pounds of a substance in the entryway of an apartment building where neither of them lived. Further, the jury could have credited the testimony that Lenti told Eisner that, as Lenti gave A.B. the marijuana, Lenti thought she was "fucked," which Eisner construed to mean that Lenti had been fronted the marijuana and that her dealer, Fo, could harm her if she did not provide him with the proceeds of the sale or the marijuana. The jury also heard evidence that, after A.B. stole the marijuana, Lenti shot him, and after initially running away, Lenti went back to retrieve the marijuana. An officer testified that five pounds of marijuana was a significant quantity with an estimated street value of thousands to tens of thousands of dollars. As the circuit court noted, this amount of marijuana would have been "so valuable that a man stole it first from Ms. Lenti at gunpoint and she was so desperate to get it back and it had such value and importance to her that she not only got it back, but she shot somebody in order to do that." The court concluded, "I don't think it's a reasonable argument to suggest that she's shooting a man, potentially killing him, taking a risk of killing him[,] because she wants five pounds of CBD oil." A jury could reasonably determine that a person would not shoot another person in order to retrieve an item unless it was of high value and the theft could not be reported to the police, which supports a finding that the substance was marijuana.

¶23 In addition, there was evidence reflecting that A.B. had a history of involvement in the drug trade. This included the bundles of cash, gun, and marijuana found in the vehicle he was driving, the smell of marijuana on his person, and the marijuana found in one of his pockets. Also, when police found A.B.'s cell phone, it rang and the officers saw a message on the lock screen from a

9

person named Fo, which established a factual basis to draw a connection between A.B. and Lenti's dealer.

¶24 Other evidence that supported the jury's finding that the substance Lenti delivered was THC (as opposed to CBD or some other legal derivative of the marijuana plant) included that Lenti made calls from jail asking a friend to go to her house to remove the "bad shit," which she said had likely gone bad and now was just a fire hazard. If credited by the jury as relevant evidence, the jury could have reasonably inferred that she was talking about marijuana plants that had dried up due to Lenti's absence and inability to tend to them.

¶25 All of the evidence summarized above, taken together, supported the jury's finding that the substance for which A.B. and Lenti were risking their lives was THC, not a legal marijuana-plant derivative.

¶26 Lenti's arguments to the contrary are not persuasive. She argues that at most, the evidence supported an inference that Lenti *believed* that the substance was marijuana, but that such a belief "standing alone" was not enough to prove that the substance was marijuana. However, even if that alone were not sufficient, as noted above, the evidence supported much more than just Lenti's belief that the substance was marijuana. This was a decision for the jury to make. And the jury had sufficient evidence to reject Lenti's theory that was based on the absence of testing, and to convict Lenti on the charge.

¶27 Lenti also attempts to distinguish **Anderson**, which, as stated, the circuit court relied on in concluding that the evidence was sufficient to support the verdict. As in this case, there, the defendant Anderson was convicted for delivering marijuana even though the marijuana was not tested. **Anderson**, 176 Wis. 2d at 199. At trial, an individual to whom Anderson delivered the marijuana

testified that he "got high" from marijuana a lot and that the "joint" Anderson provided him made him lightheaded and tasted and smelled different from cigarettes. *Id.* at 201. In addition, Anderson told police that he had smoked marijuana in the past and would sometimes sell it, that the substance he was charged with delivering was marijuana, that he and others "sat there and got high" from the marijuana, and that what they smoked was "good shit." *Id.* at 200.

¶28 On appeal, we rejected Anderson's argument that the evidence was insufficient to sustain the jury's determination that the substance Anderson delivered was marijuana. *Id.* at 201-03. After noting that the identification of a controlled substance can be established by a variety of "circumstantial" evidence, we concluded:

> Anderson's in-custody statement to the police officer established that he had sufficient lay experience based on familiarity through prior use, trading, and law enforcement so that his admission that he gave "marijuana" to his friends at the time of the alleged offense was sufficient to establish beyond a reasonable doubt that the substance was in fact marijuana.

*Id.* at 202-03.

¶29 Lenti contends that ***Anderson*** does not support the conclusion that, based on the evidence presented here, the jury could reasonably find that the substance involved was illegal THC. She advances two reasons for this view. First, she argues that when ***Anderson*** was decided in 1993, THC was defined in the statutes differently such that then, any quantity of THC in a substance was illegal, whereas now, hemp, which contains a trace amount of THC, is legal. Therefore, in Lenti's view, testing or else evidence specifically addressing the effects experienced by someone who consumed the possessed substance, is necessary to prove the second element of the crime. Second, she argues that

11

*Anderson* is distinguishable because here, unlike in *Anderson*, "there was no evidence that Lenti was an experienced user of marijuana" or that "she smoked some of the product she gave to [A.B.]"

¶30 As for Lenti's first argument, nothing about the changes in the law contradicts the longstanding holding in *Anderson*, which is that evidence other than a laboratory test can be sufficient to prove the identity of a controlled substance in a drug-related crime, and the even longer-standing precedent on which the *Anderson* court relied. *See id.* at 200-01 (discussing *State v. Wind*, 60 Wis. 2d 267, 208 N.W.2d 357 (1973), and *State v. Johnson*, 54 Wis. 2d 561, 196 N.W.2d 717 (1972)); *see also Wind*, 60 Wis. 2d at 272 (affirming a marijuana conviction in the absence of testing specific for marijuana and based on "circumstantial" evidence: namely, expert opinion that the substance was "probably marijuana" and evidence that a police officer "asked [the defendant Wind] for marijuana, and Wind agreed to sell marijuana and charged a price which would indicate it was marijuana"). As the *Johnson* court observed in rejecting the defendant Johnson's argument that the circuit court erred in permitting a lay person to identify the drug in question:

> While a chemical analysis may be a more scientific test to determine the nature of a drug, nevertheless as a practical matter in this type of case where the substance has been ingested, no such test is available. Without the use of satisfactory circumstantial evidence, there could be no convictions in this type of case. When a chemical analysis is impossible, it need not be shown and if the circumstantial evidence is sufficiently strong, it may support a verdict ….

*Johnson*, 54 Wis. 2d at 567; *see also Jones v. Commonwealth of Kentucky*, 331 S.W.3d 249, 254 (Ky. 2011) (collecting cases and noting that "even with the adoption of ['imitation controlled substances'] statutes by states across the

country, courts still almost uniformly allow the introduction of circumstantial evidence in the absence of chemical testing to identify alleged controlled substances").

¶31     That the legislature has distinguished different derivatives of the marijuana plant does not mean that evidence other than a lab report cannot establish that a substance is THC.  As we have summarized at length above, the evidence of the circumstances surrounding the attempted transaction between Lenti and A.B. provided an ample basis for the jury to find that the substance was illegal THC, not hemp or some other readily available legal derivative.  Lenti's argument would suggest that chemical testing of the substance is now required for the State to prove possession with intent to deliver THC, which is contrary to Wisconsin precedent.

¶32     Regarding Lenti's second argument—that, unlike in this case, in *Anderson* there was evidence that the defendant was an experienced user of marijuana and had smoked the marijuana at issue—this does not mean that the evidence here was insufficient.  *Anderson* concludes that the identity of a controlled substance can be proven with a variety of evidence.  *Anderson*, 176 Wis. 2d at 202-03.  It does not require circumstances identical to those in *Anderson*, *i.e.*, evidence of prior experience with the controlled substance or the substance's effects once ingested.

¶33     In sum, as set forth above, the evidence supported the jury's finding that the substance that Lenti arranged to sell to A.B. was marijuana.

### III. The evidence was sufficient to support Lenti's conviction for second-degree reckless injury.[3]

¶34 Lenti raised a claim of self-defense at trial, and the circuit court instructed the jury on self-defense. On appeal, Lenti argues that the evidence was insufficient to support the jury's verdict finding Lenti guilty of second-degree reckless injury, specifically, that she did not act in self-defense. To convict Lenti of second-degree reckless injury, in violation of WIS. STAT. § 940.23(2)(a), the jury was required to find the following elements: (1) Lenti caused great bodily harm to A.B.; and (2) Lenti "caused great bodily harm by criminally reckless conduct." WIS. JI–CRIMINAL 1252 (2015). For the jury to find that Lenti engaged in "criminally reckless conduct," it had to find that: (1) Lenti's conduct "created a risk of death or great bodily harm to another person"; (2) "the risk of death or great bodily harm was unreasonable and substantial"; and (3) Lenti "was aware that her conduct created the unreasonable and substantial risk of death or great bodily harm." WIS. JI–CRIMINAL 1252 (2015); *see also* WIS. STAT. § 939.24(1).

¶35 In light of Lenti's self-defense theory, if the jury found all the elements of second-degree reckless injury, it then had to decide whether: (1) Lenti believed that A.B. presented "actual or imminent unlawful interference with her person"; (2) Lenti "believed that the amount of force [she] used ... was necessary to prevent or terminate the interference"; and (3) Lenti's "beliefs were reasonable." WIS. JI–CRIMINAL 805 (2023) (footnote omitted). On the self-defense issue, the burden shifted to the State "to prove beyond a reasonable doubt

---

[3] Because Lenti does not challenge the penalty enhancer for use of a dangerous weapon, we do not discuss it.

14

that [Lenti's] evidence did not negate an element necessary to convict." *See State v. Pettit*, 171 Wis. 2d 627, 640, 492 N.W.2d 633 (Ct. App. 1992).

¶36    Lenti acknowledges that the evidence was sufficient for the jury to conclude that Lenti fired the shot that hit A.B. Her argument is that the State failed to prove that she acted unreasonably in doing so and therefore did not prove that she engaged in criminally reckless conduct. In support of this argument, Lenti highlights evidence that she told Eisner that she feared for her life when, according to her, A.B. pointed a gun at her and threatened to kill her. Lenti also notes that even though the jury could reasonably find that she shot A.B. only after A.B. took the marijuana and turned around and the two were separating, the jury should have found that the threat had not "entirely subsided." According to Lenti, because A.B. could have still shot at her after he turned and started moving away from her, the evidence was not sufficient to prove that Lenti's shooting A.B. was not acting in self-defense. Lenti emphasizes evidence that A.B. lied to police while at the hospital, saying that a "black man" shot him, which she submits would have supported a "strong inference" that A.B. lied because he knew that he had been the aggressor toward Lenti.

¶37    However, Lenti's argument ignores the evidence supporting the reasonable inference that Lenti shot A.B. because she was desperate to regain possession of the marijuana, not because she believed it was necessary to prevent A.B. from shooting her. As the jury heard, Lenti told Eisner that Lenti thought she was "fucked" because she now owed her dealer either the marijuana or its value, which was estimated to be thousands to tens of thousands of dollars, and the evidence that, if Lenti was unable to compensate her dealer, she was likely to be subjected to violence as a result. This evidence supported a reasonable inference that Lenti had a motive to shoot A.B., even if he no longer posed an immediate

physical threat to her. As the prosecutor emphasized in closing: "[Lenti] needed the marijuana back. And that is not self-defense. Recovering your illicit drugs is not self-defense."

¶38 The State also presented evidence that Lenti did not consistently maintain her self-defense theory. In a jail call to a friend, Lenti shared an entirely different defense theory: that she never shot at A.B. at all, that she was selling shoes to a third individual; that the third individual hit her and attempted to rape her, but she escaped; and that the third individual must have been the person who shot A.B. Based on Lenti's statement during the call suggesting that she never shot anyone, the jury had a reasonable basis to doubt Lenti's contradictory theory at trial that she shot A.B. but that it was in self-defense.

¶39 Moreover, even if the jury believed that A.B. lied to police about who shot him, this would not mean that the jury was required to accept Lenti's self-defense theory. Instead, A.B.'s lie supported multiple inferences, including that he was trying to misdirect police from learning about his role in the drug deal and from finding his illegal gun. Viewed in the light most favorable to the State, the evidence supported the jury's verdict that Lenti shot A.B. and that when she did, she lacked a reasonable belief that shooting him was necessary to prevent A.B. from killing or seriously injuring her.

¶40 Accordingly, considering all the facts in the light most favorable to the State and the conviction, the evidence at trial was sufficient to support the jury's finding that Lenti was not acting in self-defense when she shot A.B.

## CONCLUSION

¶41 For the reasons set forth above, we reject Lenti's arguments and affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.